The Stuart Company v. Commissioner.
Stuart Co. v. Commissioner
Docket No. 12473.
United States Tax Court
1950 Tax Ct. Memo LEXIS 160; 9 T.C.M. (CCH) 585; T.C.M. (RIA) 50171; June 30, 1950
*160 On the facts, held, that $75,000 paid by the petitioner to secure the cancellation of an onerous contract is properly deductible during the fiscal year 1943 as an ordinary and necessary business expense, and that $122,700 which the petitioner was obligated to pay for the purchase of a trade mark is a capital expenditure which is not deductible as an ordinary and necessary business expense. A. Calder Mackay, Esq., Arthur McGregor, Esq., and F. Edward Little, Esq., 728 Pacific Mutual Bldg., 523 West Sixth St., Los Angeles, Calif., for the petitioner. R. E. Maiden, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner has determined deficiencies in the petitioner's income tax, declared-value excess profits tax, and excess profits tax *161 for the fiscal years ended March 31, 1943, March 31, 1944, and March 31, 1945, as follows: Declared-
Value
Excess
Excess
Fiscal Year
Income
Profits
Profits
Ended
Tax
Tax
Tax
March 31, 1943
$1,733.81
$ 263.70
$ 8,495.95
March 31, 1944
52,808.66
March 31, 1945
287.13
6,591.80
68,286.82
The issue in this proceeding is whether certain payments made by the petitioner during the years in question were made, either in part or in whole, to secure the cancellation of an onerous contract; or whether they were made, either in part or in whole, for the purchase of a trade-mark. The respondent contends that the entire payments were capital expenditures made to purchase a trade-mark and has asserted the above deficiencies. The petitioner contends that the entire payments were ordinary and necessary business expenses made to secure relief from an onerous contract and claims an overpayment in his taxes for the years in question. The parties are in agreement on a number of other issues raised by the pleadings relative to adjustments in the petitioner's taxes for the years in question which are dependent upon the decision of the main issue *162 in the proceeding. The petitioner filed its returns for the years in question with the collector for the sixth district of California. The record in this proceeding consists of oral testimony and various exhibits. Findings of Fact Sometime in the fall of 1940, Arthur Hanisch, who was the principal organizer and stockholder of The Stuart Company, which is the petitioner herein, decided to go into business in California. In December of 1940, Hanisch was introduced to Dr. Henry Borsook, who was a professor of biochemistry at the California Institute of Technology, and Maxwell H. Lewis, who was the vice president of The Vita-Food Corporation (hereinafter referred to as "Vita-Food") which had been organized under the laws of California in November, 1940. Dr. Borsook was interested in providing adequate vitamin concentrates to the greatest number of people at the lowest possible cost and had done a great deal of research in vitamins and in nutrition. He was a consultant to Vita-Food which manufactured and distributed locally at this time a vitamin concentrate which had been developed under the supervision of Dr. Borsook. Vita-Food was primarily interested in the manufacture of *163 the vitamin concentrates and desired to associate itself with someone who would be willing to undertake national distribution of its vitamin products. Accordingly, on February 3, 1941, Hanisch entered into an informal agreement with Vita-Food which provided that Hanisch was to set up a sales and merchandising organization to distribute the vitamin concentrate produced by Vita-Food at stipulated retail prices. Hanisch agreed to purchase 3,000 gallons of the vitamin concentrate from Vita-Food and to market it under a trade name which would remain the property of Vita-Food. On March 8, 1941, Hanisch entered into a subsequent informal agreement with Vita-Food under which he agreed to purchase an additional 3,000 gallons of the vitamin concentrate. This agreement also provided that: "We [Vita-Food] understand that you [Hanisch] are in process of forming two corporations, one to be named 'The Shaler Food Products Company', which company will sell to food outlets, under the name 'Vitaplex' the concentrate purchased by you under our said letter of February 3rd, upon condition that such outlets sell the same to consumers at a price not in excess of $1.60 per 16 oz. bottle; and the other *164 to be named 'The Stuart Company', whose sales will be confined to drug stores and allied outlets [under the name 'The Stuart Formula'] for resale at a price not in excess of $1.85 per 16 oz. bottle. "We further understand it is your desire, and it is agreeable to us that, as soon as these corporations have been organized, separate written contracts will be entered into between them and ourselves embodying the applicable matters above set out as well as the conditions of future purchases and sale by them of said product in accordance with understandings had at our recent conferences." By March 27, 1941, Hanisch had completed the organization of the two corporations; and The Stuart Company, which was named after Hanisch's younger son, was incorporated under the laws of California on that date. This corporation, which is the petitioner herein, was organized to distribute the vitamin concentrate manufactured by Vita-Food under the trade name "The Stuart Formula" by making a personal approach to doctors and inducing them to recommend the product to their patients. "The Stuart Formula" was never advertised to the public and was sold only in drug stores. During the years in question, *165 The Stuart Company kept its books and filed its returns on an accrual basis of accounting. Its fiscal year ended on March 31, of each year. Hanisch paid $1,000 to The Stuart Company in exchange for its entire authorized capital stock of 1,000 shares at a par value of $1 per share. Hanisch then transferred 250 shares of stock to two of his associates in the organizing of the corporation and transferred 150 shares to Maxwell H. Lewis, as the representative of Vita-Food. He retained 600 shares for himself. Between May 5, 1941, and November 28, 1942, Hanisch loaned $70,000 to The Stuart Company for working capital. The Shaler Food Products Company, named after Hanisch's older son, was also incorporated under the laws of California on March 27, 1941. It was organized to distribute through grocery stores a similar vitamin concentrate manufactured by Vita-Food under the trade names "Vitaplex" and "Calplex." "Vitaplex" and "Calplex" were advertised directly to the public. Hanisch paid $1,000 to The Shaler Food Products Company in exchange for its entire authorized capital stock of 1,000 shares at a par value of $1 per share. Hanisch then transferred 250 shares of stock to two of his *166 associates in the organizing of the corporation and transferred 150 shares to Maxwell H. Lewis, as representative of Vita-Food. He retained 600 shares for himself. On May 5, 1911, The Stuart Company and The Shaler Food Productscompany as first parties, Vita-Food as second party, and Hanisch as third party, entered into a formal written contract which memorialized the prior informal agreements between Hanisch and Vita-Food. This contract provided, inter alia: "2. THE STUART COMPANY, one of first parties, agrees that the concentrate received by it under said contract of March 7, 1941, will be sold and distributed under second party's trademark or label 'THE STUART FORMULA' and/or under such other of second party's trademarks or labels as may be mutually agreed upon by first and second parties, to retail at $1.95 per pint bottle plus any applicable sales tax: "3. SHALER FOOD PRODUCTS COMPANY, one of first parties, agrees that the concentrate received by it under said contract of February 3, 1941, will be sold and distributed under second party's trademark or label 'VITAPLEX' and/or under such other of second party's trademarks or labels as may be mutually agreed upon by first and *167 second parties to retail at $1.59 per pint and 69" per 5 fluid ounces, plus any applicable sales tax. "4. First parties shall, within a reasonable time, undertake and carry on at their sole expense, an appropriate and adequate sales campaign for the purpose of creating and maintaining a satisfactory market for such products. "5. Except as herein otherwise provided, the products of second party shall be sold for commercial use and resale only through first parties, but it is understood that second party can not economically operate its plant at an average production of less than 2,000 pints per day of all items and the prices to be paid to second party for its said products as hereinafter set out are based upon this fact. * * * "6. First parties shall have the exclusive right to sell said VITAPLEX and STUART FORMULA until November 1, 1941. Such right shall continue thereafter until and unless terminated by written notice from second party, provided, however, that such termination shall not become effective until and unless during any sixty day period between said November 1, 1941, and May 1, 1942, the combined purchases of such products by first parties from second party shall *168 not have averaged fifteen hundred pints per day, or unless during any sixty day period after said May 1, 1942, such purchases shall not have averaged two thousand pints per day; and provided further, the date of any such termination shall be not less than sixty days from and after such notice of termination of said right. In determining performance hereunder consideration shall be given to purchases by first parties from second party of any other products on a dollar basis at the prices paid therefor. First parties shall not be held to strict performance hereunder if such failure is due to conditions beyond their control, such as adverse legislation, strikes and/or delays in transportation. "7. First parties shall handle no other products than those manufactured or produced by second party, and shall be the sole distributors of all products manufactured or produced by second party except as herein otherwise provided. * * *
"10. Any and all trademarks or labels under which the concentrates hereinbefore specifically described or any other products manufactured by second party which may hereafter be marketed or distributed or offered for sale by first parties or either thereof, *169 shall at all times be and remain the sole and exclusive property of second party, and the right or rights of first parties to distribute and or market or offer for sale such products or any other product hereafter produced by second party shall continue only so long as this agreement is in full force and effect. "11. Second party shall not directly or indirectly sell any of its products to any person, firm or corporation other than first parties, save and except the product now being marketed under the name 'VITALL' in Los Angeles County. * * * "12. Second party agrees to fill all orders placed by first parties as promptly as possible consistent with the receipt of materials, conditions of labor, and other matters within its control. * * *
"19. This contract shall remain in full force and effect for the period of ten years from and after the date hereof, and may be extended at the option of first parties for an additional period of ten years by written notice to second party, * * * provided, however, that this contract may be terminated by second party if for any sixty consecutive days, at any time after November 1, 1941, first parties shall not have purchased the minimum *170 quantities of products hereinbefore specified in paragraph 6 (six) hereof, upon sixty days notice of intention so to do, unless during such sixty-day period any such deficiency shall be removed and the minimum quantities aforesaid ordered and paid for; otherwise, all rights of first and third parties hereunder shall cease at the expiration of the sixty-day period specified in such notice of termination." Vita-Food experienced certain difficulties during 1941 in the manufacture of the vitamin concentrates which it supplied to The Stuart Company and to The Shaler Food Products Company for distribution. The bottled product sometimes became gaseous from exposure to the sun and exploded or ran over the sides of the bottle. The total damage was less than 1 per cent of the gross sales of the vitamin concentrates. Vita-Food made complete restitution of all damage caused, and by the end of 1941 had solved the problem by making a minor change in the formula. On June 23, 1942, a certificate of registration of the trade-mark "The Stuart Formula" was issued to Vita-Food by the Secretary of State of California. On September 8, 1942, the United States Commissioner of Patents issued to Vita-Food *171 a certificate of registration of the trade-mark "The Stuart Formula" in accordance with an application under the Trademark Act of 1920 which had been made by Vita-Food on May 15, 1941. The operations of The Shaler Food Products Company were never successful and that corporation was merged with the petitioner on July 3, 1942. The petitioner subsequently received permission from the Commissioner of Corporations to increase its capital stock by 1,000 shares, and these additional shares were issued to its original stockholders in proportion to their holdings. As early as February, 1942, the petitioner began negotiations with Vita-Food in order to modify the contract of May 5, 1941. Petitioner desired to acquire an express owner's interest in the trade-mark and wanted to obtain lower purchase quotas and lower purchase costs. In August, 1942, the petitioner informed Vita-Food that it would not undertake an extensive sales promotion campaign unless it was given an interest in the trade-mark. On August 10, 1942, Vita-Food submitted a redraft of the contract to the petitioner, in which the petitioner was given a conditional one-half interest in the trade-mark, provided its sales reached *172 and maintained a certain level. The petitioner rejected this redraft because it was not given a one-half interest in the trade-mark in fee simple and because the cost and the purchase quotas were not satisfactorily adjusted. In September, 1942, Hanisch was informed that it was possible to obtain the vitamin products which were being supplied to The Stuart Company by Vita-Food for approximately one-half the price that Vita-Food was charging. Thereupon, Hanisch made an independent investigation of the price at which comparable products could be obtained from other manufacturers and discovered that they were available at substantially lower prices. The petitioner was never able to meet the purchase quotas called for by paragraph 6 of the contract of May 5, 1941, and on October 8, 1942, Vita-Food served written notice on petitioner that since "you have failed to meet your quotas for the 60-day period from and after August 1, 1942, * * * your exclusive right to sell under the said contract is hereby terminated in accordance with paragraph 6 thereof. This termination shall be effective sixty (60) days after the service of this notice. In all other respects, the contract remains in full *173 force and effect." On October 12, 1942, the petitioner informed Vita-Food that: "We shall endeavor to the best of our ability to reinstate the contract dated May 5, 1941 by removing the shortages in quotas. However, in fairness to you, we should inform you that we do not believe this will be possible. "If we are unable to reinstate the contract we shall regard it as terminated for all purposes, at the expiration of 60 days from date of notice, in accordance with the provisions of Paragraph 19 thereof which incorporates Paragraph 6 of the contract. "You having given notice of termination the same is accepted in accordance with the provisions of the contract and we do not concede the existence of any such intermediate procedure as you suggest. No attempt on your part to withdraw the notice will be recognized." The petitioner then consulted three trade-mark counsel on the question of the ownership of the trade-mark. "The Stuart Formula." Two of the opinions received were to the effect that the ownership of the trade-mark was in Vita-Food; one of the opinions declared that in so far as the contract of May 5, 1941, purported to invest in Vita-Food the title to the trade-mark it *174 was a nullity, and that the registration of the trade-mark by Vita-Food was cancellable upon application by the petitioner to the United States Patent Office. The petitioner and Hanisch, acting individually, began a series of conferences with Vita-Food on November 18, 1942, in order to settle their differences. These conferences were unsuccessful, and on November 23, 1942, the petitioner and Hanisch sent to Vita-Food a notice of rescission of the contract of May 5, 1941, based upon fraud in the inception of the contract and failure of consideration in its performance. On November 25, 1942, Vita-Food filed suit in the Superior Court of the State of California for the County of Los Angeles, in which it asked that court to permanently enjoin the petitioner and Hanisch from using the trade-mark "The Stuart Formula" upon any product not manufactured by Vita-Food. On November 25, 1942, the court issued a restraining order temporarily enjoining the petitioner from using the trade-mark, as requested by Vita-Food, and ordered the petitioner to appear on a specified date and show cause why the restraining order should not be made permanent. Prior to the expiration of the time for the filing *175 of an answer by petitioner, negotiations were resumed between petitioner and Vita-Food, and a settlement of the difficulties between the parties was reached. This agreement was entitled "Agreement of Settlement of Litigation and Cancellation of Contract," and provided: "It is hereby agreed by and between The Vita-Food Corporation, first party, The Stuart Company, second party, and Arthur D. Hanisch, third party, as follows: "Whereas an action is now pending in the Los Angeles County Superior Court by first party as plaintiff against second and third parties and others as defendants, being Action No. 482045, and Whereas the parties hereto did on May 5, 1941, execute an agreement in writing to which reference is hereby made for full details, and Whereas the parties hereto desire to settle and adjust all their disputes and differences against and with each other whether involved in said pending litigation or otherwise, so that said action can be dismissed, said contract cancelled and terminated, and Whereas said litigation involves the dispute, among other things, as to the claim of second party to the ownership of a trade mark, 'The Stuart Formula', which trade mark second party *176 claims to own, and Whereas second party desires to maintain the continuity of the present market therefor, and Whereas first party in addition to the convenants of the second and third party herein and as a part thereof relies upon the personal ability of third party as managing agent of second party, "NOW THEREFORE IT IS AGREED: "1. First party agrees to dismiss with prejudice said Action No. 482045. All parties hereto agree that the said agreement of May 5, 1941, is hereby cancelled and terminated as fully and to the same extent as though the same had never been executed, and all parties hereto hereby waive and release any and all claims and demands of every kind, character or description which any thereof have, or may have or claim to have against any thereof, or the officers, agents, or employees of any of them, whether by reason of said contract or otherwise. * * * "2. First party quitclaims without warranty (except that it does warrant that it has not heretofore conveyed, assigned or encumbered any right therein) to second party the trade mark 'The Stuart Formula.' First party agrees to execute appropriate assignments, if requested, of registrations on file with the Secretary *177 of State of the State of California and the U.S. Commissioner of Patents. "3. Second and third parties agree to pay to First Party the sum of $75,000.00 as follows: $35,000.00 upon the execution of this agreement, receipt of which is hereby acknowledged by first party, and $40,000.00 payable at the rate of $4,000.00 per month as per note executed concurrently herewith, which note shall be an obligation independent of but not in addition to the above amount. "4. Second party agrees to pay to first party on a royalty basis and as additional consideration for the execution of this agreement the sum of $122,700.00 which sum is additional to the above mentioned $75,000.00. The said $122,700.00 shall be paid at the rate of 7 1/2 cents per unit of vitamin concentrates as sold and marketed by second party beginning October 1, 1943, and continuing until the said sum of $122,700.00 is fully paid. * * * Such payments shall be paid on the equivalent of the said unit of vitamin concentrates whether the same shall hereafter be sold and marketed in liquid, tablet, or in any other physical form or whatever the size of the package or packages by second party, whether sold under the trade mark The *178 Stuart Formula or not. * * *
"6. Second and third parties agree that if prior to full payment of the sums agreed to be paid to first party in accordance with paragraphs 3 and 4 hereof either (a) the business of second party is sold or (b) the good will of the business of second party is sold or (c) the trade mark 'The Stuart Formula' is sold or licensed by second party to any other person, firm or corporation, or (d) an attempt is made by second or third party to do any of the acts in this paragraph 6 specified, then, and in any such event, the balance remaining unpaid upon the obligations of second party set forth in par. 4 hereof shall become forthwith due and payable by second and third parties jointly and severally to first party. "7. In the event of the abandonment of said trade-mark 'The Stuart Formula' by second party or of the insolvency or bankruptcy of second party the trade mark 'The Stuart Formula' and all registrations thereof shall vest in and be the property of first party. * * * "8. Arthur O. Hanisch third party covenants and agrees that until full payment of the sum specified in paragraph 4 hereof he will not pledge or assign his stock in second party so *179 as to reduce his holdings to less than 51% of the capital stock of second party. Third party understands and agrees that his obligations herein set forth are primary upon him with reference to the provisions set forth in paragraphs 3, 5, 6 and 8 but not paragraph 4, except as referred to in paragraphs 5, 6, and 8, and not merely those of guarantor or surety. "9. Second and Third parties hereby waive and relinquish to and in favor of First party any claims or interest that they or either of them may have in and to the trade marks named as follows: 'Vitall', 'Calplex', 'Made by the Calplex Process', 'Buoyant B' and 'Vita-Diet'. * * *
"12. First party hereby assigns to third party whatever capital stock of second party and/or Shaler Food Products Company now standing in the name of Max H. Lewis, which is represented by certificates now in possession of second party." * * *
On November 30, 1942, Vita-Food delivered to the petitioner the certificates of registration of the trade-mark "The Stuart Formula $" which Vita-Food had obtained in its name. A formal assignment of Vita-Food's interest in the trade-mark to the petitioner was executed by Vita-Food on June 24, 1943. *180 From May 5, 1941, to October 31, 1942, the petitioner made gross sales of "The Stuart Formula" totalling $437,613.87. During that period 17,428 doctors were personally contacted and induced to recommend "The Stuart Formula" to their patients, and 6,746 drug stores were retailing "The Stuart Formula." From the date of its organization March 27, 1941, until October 31, 1942, the petitioner suffered net operating losses, as shown by its books, which totalled $15,451.56. On October 31, 1942, the petitioner had total assets of $62,159.47 and total liabilities of $82,489.98. Since November 28, 1942, the petitioner has distributed vitamin concentrates produced by other vitamin manufacturers under the trade name "The Stuart Formula." The shares of stock in the petitioner had no value on November 28, 1942. The petitioner was primarily obligated to pay $75,000 to Vita-Food under the contract of November 28, 1942, in order to secure the cancellation of an onerous contract, of which $35,000 was paid upon the execution of the agreement and $40,000 was paid from December 1942 through September 1943 in monthly installments of $4,000 each. The petitioner was also primarily obligated to *181 pay $122,700 to Vita-Food under the contract of November 26, 1942, for the purchase of the trade-mark "The Stuart Formula," at the rate of 7 1/2 cents per unit of vitamin concentrates sold by the petitioner after October 1, 1943. Opinion HARRON, Judge: The issue in this proceeding is whether, considering all the facts, the payments made by the petitioner pursuant to the contract of November 28, 1942, were made, either in part or in whole, for the purpose of cancelling an onerous contract as contended by the petitioner; or whether they were made, either in part or in whole, for the purchase of the trade-mark "The Stuart Formula" as contended by the respondent. It is well settled that payments made to secure relief from an onerous contract are deductible as ordinary and necessary business expenses under section 23(a) of the Internal Revenue Code. Helvering v. Community Bond & Mortgage Co., 74 Fed. (2d) 727; affirming 27 B.T.A. 480; Alexander J. Cassatt, 47 B.T.A. 400; aff'd., 137 Fed. (2d) 745; Cleveland Allerton Hotel, Inc. v. Commissioner, 166 Fed. (2d) 805. *182 And it is equally well settled that the purchase of a trade-mark is a capital expenditure, no part of which is deductible as a business expense. Seattle Brewing & Malting Co., 6 T.C. 856; aff'd., per curiam, 165 Fed. (2d) 216; Coca-Cola Bottling Co., 6 B.T.A. 1333; cf. Rainier Brewing Co., 7 T.C. 162; aff'd., per curiam, 165 Fed. (2d) 217. Upon careful consideration of the terms of the contract of November 28, 1942, the conduct of the parties in the execution of its provisions, their statements, the testimony of disinterested witnesses, and our examination of the various other contracts and exhibits placed in evidence at the trial, we have concluded that the petitioner, which was on an accrual basis, was obligated to pay $75,000 to Vita-Food to secure cancellation of the contract whereby it was bound to buy vitamin products exclusively from Vita-Food, and that the petitioner was obligated to pay $122,700 to Vita-Food for the purchase of the trade-mark "The Stuart Formula." The evidence discloses that the petitioner *183 desired to abrogate the contract under which it was bound to buy all the vitamin products which it distributed from Vita-Food because it could obtain similar vitamin concentrates at substantially lower prices from other manufacturers. It therefore entered into negotiations with Vita-Food to effect a settlement of the contract. These negotiations were finally successful, and we have found as a fact that, as part of the settlement agreement, the petitioner agreed to pay $75,000 to Vita-Food to cancel the contract. Examination of the evidence also discloses that the remainder of the consideration called for by the contract is properly allocable to the purchase of the trade-mark "The Stuart Formula." The petitioner desired to continue in the business of distributing vitamin concentrates to retail outlets. Much good will had been built up for "The Stuart Formula" through the extensive merchandising campaign conducted by the petitioner during 1941 and 1942. Prior to November 28, 1942, the petitioner made a number of attempts to purchase an interest in the trade-mark, but was unable to achieve a satisfactory agreement with Vita-Food. From May 5, 1941, to October 31, 1942, the petitioner *184 made gross sales of "The Stuart Formula" totalling $437,613.87. During that period, 17,428 individual doctors had been personally contacted and induced to recommend "The Stuart Formula" to patients who were in need of additional vitamins, and vitamin concentrates under the name "The Stuart Formula" were being retailed by 6,746 different drug stores. From our examination of all the evidence, we have found as a fact that the petitioner purchased the trade-mark "The Stuart Formula" for $122,700, to be paid at the rate of 7 1/2 cents per unit of vitamin concentrates sold by the petitioner after October 1, 1943. As part of the settlement agreement between the petitioner and Vita-Food, Vita-Food assigned to Hanisch 300 shares of stock of the petitioner which had been issued to Maxwell H. Lewis as representative of Vita-Food. The petitioner introduced competent evidence that this stock had no value on November 28, 1942, and respondent has made no contention that it did have any value. We have found as a fact that the 300 shares of stock assigned by Vita-Food had no value, and no part of the total consideration paid by the petitioner under the contract of November 28, 1942, with Vita-Food *185 is properly allocable to the purchase of these shares of stock. In accordance with our findings of fact, it is held that $75,000 paid by the petitioner to secure the cancellation of an onerous contract is properly deductible during the fiscal year 1943 as an ordinary and necessary business expense, and that $122,700 which the petitioner was obligated to pay for the purchase of a trade-mark is a capital expenditure which is not deductible as an ordinary and necessary business expense. Decision will be entered under Rule 50.