H. H. HELGERSON and D. F. Helgerson, Appellees,

v.

UNITED STATES of America, Appellant.

Frank C. POWELL, Jr., and Doris Dae Powell, Appellees,

v.

UNITED STATES of America, Appellant.

Nos. 19841, 19848.

United States Court of Appeals, Eighth Circuit.

June 5, 1970.

Rehearing Denied June 19, 1970.

**1294**

Ann E. Belanger, Atty., Dept. of Justice, Washington, D. C., for appellant; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and William A. Friedlander, Attys:, Dept. of Justice, Washington, D. C., and William F. Clayton, U. S. Atty., Sioux Falls, S. D., on the brief.

Robert C. Heege, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for appellees.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and GIBSON, Circuit Judges.

MATTHES, Circuit Judge.

In these actions separately instituted and later consolidated, appellees seek refunds of Federal income taxes paid for the years 1961 and 1962. Taxpayers in each case are husband and wife, having filed joint Federal income tax returns for the years in question. All parties agreed that the only issue for determination was whether each pair of taxpayers was entitled to deduct on their 1961 and 1962 joint returns, as ordinary and necessary nonbusiness expenses under 26 U.S.C. § 212, certain attorneys' fees and expenses incurred in litigation instituted in connection with the sale of shares of stock in a corporation, or whether such expenses must be capitalized and added to the basis of the stock. By memorandum opinion of January 27, 1969, reported sub nom. Powell v. United States, 294 F.Supp. 977 (D.S.D.1969), Chief Judge Nichol found in favor of appellees' claims, and judgments were subsequently entered for $8,383.33 plus interest in our No. 19,841 and for $26,678.98 plus interest in our No. 19,848. The Government has appealed, and we reverse. We have jurisdiction under 28 U.S.C. § 1291.

The facts are established by stipulation. On December 3, 1960, Frank C. Powell, Jr., Doris Dae Powell, and H. H. Helgerson (hereafter the Stockholders)[1] granted an option to The Gibralter Life Insurance Company of America (hereafter Gibralter) to purchase 38,388 shares of the capital stock of The National Life of America (hereafter National), a South Dakota life, health, and accident insurance corporation, for the purchase price of $2,591,190, to be paid in three installments. In conjunction with the option, the Stockholders executed a Stock Purchase Agreement and Addenda thereto with Gibralter, paragraph 3 of Section I of which reads as follows:

"3. At all times after deposit of [the certificates representing the 38,388 shares of stock] with [The Republic National Bank of Dallas] and until said purchase price is paid in full to Stockholders, and except as otherwise expressly hereinafter provided, said bank is to hold such stock certificates in escrow in accord with

---

1. D. F. Helgerson, wife of H. H. Helgerson, was not a party to any of the contracts and agreements incident to the sale of stock in The National Life of America corporation. Neither did she join in the South Dakota circuit court proceedings in which the attorneys' fees and expenses here involved were incurred. Her presence in our No. 19,841 stems only from the joint tax returns she filed with her husband for the years 1961 and 1962.

the terms hereof. If Gibralter should default in any payment herein provided said bank shall upon demand deliver said stock certificates to Stockholders, who shall thereupon and thereafter have all rights whatsoever of pledgees of such stock as security for the payment of the balance of such purchase price. So long, however, as Gibralter is not in default under any terms or provisions hereof, Gibralter shall have all rights whatsoever as to voting of such stock and ownership thereof, subject to payment of the balance of such price as provided herein. However, and until such purchase price is paid in full, Gibralter is to take no action whatsoever adversely affecting the valuation of such stock unless there is acquiescence therein by Stockholders * * *."

Prior to the expiration date specified in the Option, the Stockholders granted an extension thereof to Gibralter. On May 31, 1961, Gibralter assigned its rights under the Option to one J. S. Shively, president of Inter-Continental Corporation, a Texas corporation. Shortly thereafter, the Stockholders entered into a Memorandum Agreement with Gibralter and Inter-Continental Corporation, as Shively's designee, the substance of which was to substitute Inter-Continental for Gibralter in the earlier Stock Purchase Agreement, Addenda, and Option, and otherwise to reaffirm the provisions of those instruments.

Pursuant to the Memorandum of Agreement, the initial net payment of $727,585.00 was made by Inter-Continental Corporation on or before June 15, 1961. The stock was placed in escrow and the proxies and resignations of the three Stockholders were delivered to Shively and Inter-Continental Corporation. On July 13, 1961, the Insurance Commissioner for the State of South Dakota took custody of the securities of National to prevent consummation of a $2,815,516.25 investment contemplated by the new management of National, referred to in the briefs as the Shively group. This action in turn precipitated a mandamus proceeding in the appropriate circuit court of South Dakota by National against the Insurance Commissioner. The Stockholders intervened in support of the Commissioner. The record does not disclose the disposition of this state action.

Under date of September 5, 1961, the Stockholders gave "Notice of Default" to Inter-Continental Corporation and Shively. Referring to paragraph 3 of the original Stock Purchase Agreement, the Stockholders specified several acts taken or contemplated by the Shively group which the Stockholders alleged were inimical to and would adversely affect the value of the stock of National, still held in escrow. The notice charged the Shively group with authorizing investments in property of dubious value, with authorizing loans secured by insufficient collateral, with selling bonds at less than the amortized value thereof, with failing to maintain proper books and records or to devote full and adequate time to the proper management of National, and with proposing a merger of National with the Texas Reserve Insurance Company, to the detriment of National's interests. Inter-Continental Corporation and Shively replied in great detail to the default notice, controverting each of the substantive charges.

On September 30, 1961, the Stockholders brought suit in a South Dakota circuit court against J. S. Shively, Inter-Continental Corporation, National, two other corporations, and four other named individuals. The record does not reveal the allegations in nor the remedy sought by the Stockholders' complaint. We are informed from the briefs that it was a class action, brought by the Stockholders for their own benefit and for the benefit of National and its stockholders and policyholders, and we presume that it related closely to the charges made in the "Notice of Default."

During the pendency of the state court action, the controversy was settled. The Stockholders entered into an agreement with all other parties to the state suit. All pending and future claims were re-

leased, all pending court actions were to be dismissed with prejudice, and on June 2, 1962, the balance of the purchase price for the stock in National was paid to the Stockholders, including interest, under the terms of the Stock Purchase Agreement and Memorandum of Agreement.

The attorneys' fees and expenses in controversy here were incurred by the Stockholders in connection with their intervention in the mandamus proceedings, the circuit court suit, the unsuccessful removal proceedings in the United States District Court, and the final consummation of the 1962 agreement terminating the controversy. None of the items deducted, which were stipulated to be reasonable and necessary, was incurred for services or expenses with respect to negotiation of the Option, Stock Purchase Agreement, Addenda, or Memorandum of Agreement.

In granting judgment for appellees, the district court held that the expenses incurred "clearly arose from a business rather than a personal matter, *i.e.*, the conservation of the value of the stock that the taxpayers held as security resulting from the sale of the controlling interest in National." 294 F.Supp. at 978. We believe that the controlling case law in this area, as recently reaffirmed by the Supreme Court in Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (April 20, 1970, aff'g 410 F.2d 313 (8th Cir. 1969), and United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (April 20, 1970), rev'g 410 F.2d 194 (7th Cir. 1969), requires us to reverse and direct the district court to enter judgment of dismissal.[2]

The statutory provision under which appellees claim nonbusiness expense deductions, 26 U.S.C. § 212, provides: "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *." We reviewed the historical background of § 212 in Woodward v. Commissioner of Internal Revenue, 410 F.2d at 317–318. We noted there that "capital expenditures are not deductible under § 212, just as they are not deductible under § 162." *Id.* at 318. The Supreme Court reiterated this basic principle in its affirming opinion.

> "Since the inception of the present federal income tax in 1913, capital expenditures have not been deductible. * * * If an expense is capital, it cannot be deducted as 'ordinary and necessary,' either as a business expense expense under § 162 of the Code or as an expense of 'management, conservation, or maintenance' under § 212."

397 U.S. at 574, 90 S.Ct. at 1304 (footnotes omitted). See Spangler v. Commissioner of Internal Revenue, 323 F.2d 913, 918–919 (9th Cir. 1963); Treas. Reg. § 1.212–1(n).

■■ The threshold inquiry must be whether the litigation fees and expenses here involved were capital expenditures. Again, we are guided by fundamental doctrine: "It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." Woodward v. Commissioner, 397 U.S. at 575, 90 S.Ct. at 1305. See Alphaco, Inc. v. Nelson, 385 F.2d 244 (7th Cir. 1967); Davis v. Commissioner of Internal Revenue, 151 F.2d 441, 443 (8th Cir. 1945), cert. denied, 327 U.S. 783, 66 S.Ct. 682, 90 L.Ed. 1010 (1946); 4A Mertens, Law of Federal Income Taxation § 25.26 (rev. ed. 1966). It is not controverted that the 38,388 shares of stock in National, amounting to a controlling interest in the corporation, constitutes a capital asset. The more specific question is whether the expenses were "incurred in the * * * disposition" of the stock. Appellees

---

2. *Woodward* was decided by this and the Supreme Court subsequent to Judge Nichol's decision in this case.

maintain that the sale had been fully consummated, except for payment of the balance of the purchase price, prior to the time expenses were incurred. They submit that the expenses were incurred in order to conserve the Stockholders' right to receive income which would be paid to them. The government directly traverses this point, stating that the fallacy in appellees' position lies in their attempt to distinguish as separate and independent transactions for tax purposes the negotiation of a sale of property and the realization of the proceeds of that sale.

The Supreme Court stated in *Woodward, supra,* and prior decisions that the deductibility of litigation expenses depends upon the *origin* of the claim or the nature of the transaction out of which the suit arose. See Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); United States v. Gilmore, 372 U.S. 39, 49, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); United States v. Patrick, 372 U.S. 53, 83 S.Ct. 618, 9 L.Ed.2d 580 (1963). See also Peckham v. Commissioner of Internal Revenue, 327 F.2d 855, 857 (4th Cir. 1964). In application of the precept that the cost of acquisition of property is a capital expenditure to the specific problem of categorizing litigation expenses, Mr. Justice Marshall observed in *Woodward* that "the simpler inquiry [is] whether the origin of the claim litigated is in the process of acquisition itself." 397 U.S. at 577, 90 S.Ct. at 1306.[3] The "origin of the claim" test is clearly applicable to this case, although here the property was sold, rather than acquired, by the Stockholders.

We conclude from the record and the stipulated facts that the attorneys' fees and expenses originated in the process of disposition of the controlling stock interest in National, and hence are not deductible by appellees under § 212. The

litigation undertaken by the Stockholders and the settlement agreement entered into by the parties cannot and should not be viewed in a vacuum, isolated from the totality of acts constituting the sale. The Stock Purchase Agreement provided for an installment sale, contemplating a period not exceeding two years before full and final payment of the purchase price would be tendered to the Stockholders. In the interim, the stock certificates would be held in escrow, with each side to the transaction possessing certain rights in the stock and duties to the other party. This bilateral relationship was spelled out in paragraph 3 of the Agreement, by which specific authority the Stockholders instituted their suit in South Dakota circuit court.

It would indeed be an artificial analysis of the facts to say that the sale of stock was fully consummated on June 15, 1961, and the litigation and settlement expenses were only remotely incidental, at best, to the sale itself. At that early date, the purchaser had not received full ownership of the object of sale, and the sellers had not received full payment of the purchase price. The litigation by the Stockholders was unquestionably designed to prevent diminution in value of the National stock held in escrow. The Stockholders' interest in the 38,388 shares continued to exist after June 15, 1961, because the certificates were the subject matter of a security arrangement between the parties. That arrangement was a protective device, an integral part of the sale itself, allowing the Stockholders to possess certain residual rights in the escrowed stock as a substitute for immediate and full payment of the purchase price. Manifestly, the attorneys' fees and expenses incurred in the protection of the Stockholders' security interest must be viewed in the broad contextual framework of the dispositive transaction.[4] We read the Supreme Court's

---

3. The Court's opinion referred specifically to Treas.Reg. 1.263(a)–2(a), providing that an example of a capital expenditure is "the cost of acquisition * * * of

* * * property having a useful life substantially beyond the taxable year."

4. Indeed, there is no other explanation for the expenses. Had the sale agreement,

teachings in *Woodward* and *Hilton Hotels* as favoring an expansive application, rather than a narrow circumscription, of the phrase "incurred in the \* \* \* disposition of a capital asset." So applied, we conclude that the expenses claimed by appellees arose out of the sale of a capital asset.

The cases of Naylor v. Commissioner of Internal Revenue, 203 F.2d 346 (5th Cir. 1953), and Beerman v. United States, 390 F.2d 638 (6th Cir. 1968), provide taxpayers with rather shifting ground upon which to build their claims. The soundness of *Naylor* was questioned by the Ninth Circuit in Spangler v. Commissioner, *supra*, at 919–920 n.15, and has been characterized as "questionable" in 4A Mertens, Law of Federal Income Taxation § 25A.12 n.40 (rev. ed. 1966). See Commissioner of Internal Revenue v. Doering, 335 F.2d 738, 741 (2d Cir. 1964), leaving open whether that court would follow *Naylor* on facts such as were there presented. The strict distinction drawn in *Naylor* between expenses incident to disposition of property and expenses incident to collection of the proceeds of the sale, the former accorded a capital and the latter a deductible nonbusiness expense status,[5] is tenuous in light of *Woodward* and *Hilton Hotels,* and consequently we decline to observe it here. The *Beerman* court limited its consideration to the issue of whether taxpayer's expenses had a business origin. The question whether the disputed items should be capitalized was not discussed. We therefore conclude that *Beerman* does not control this case, particularly in view of *Woodward* and *Hilton Hotels.*

The judgments are reversed and the causes remanded with directions to dismiss the actions.

for example, called for a lump-sum payment of the purchase price, there would have been no necessity for an escrow arrangement, and the Stockholders would hardly be concerned with any decrease in value of the 38,388 shares, since they would have already been paid full value therefor. We believe it is unrealistic to describe the expenses here as *solely* costs of collection, inferring that their "origin" is not in the sale itself.

5. The same distinction was drawn in Munson v. McGinnes, 283 F.2d 333, 335 (3d Cir.), cert denied, 364 U.S. 880, 81 S.Ct. 171, 5 L.Ed.2d 103 (1960). The Third Circuit distinguished *Naylor* and concluded that the attorneys' fees there involved must be capitalized. However, the scholarly discourse in the opinion and the ultimate decision reached appear to draw rather close boundaries around those "collection" expenses which would be deductible under § 212.