**GREAT LAKES PIPE LINE COMPANY, a corporation, and G. H. Hagle, Trustee in Dissolution, of Great Lakes Pipe Line Company, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 17949-4, 18615-4.**

United States District Court, W. D. Missouri, W. D.

Dec. 20, 1972.

Leon B. Seck, Harrisonville, Mo., for plaintiffs.

Stephen J. Swift, Attorney-Tax Division, Department of Justice, for defendant.

## FINDINGS, OPINION AND JUDGMENT

ELMO B. HUNTER, District Judge.

This is a civil action brought by plaintiffs, Great Lakes Pipe Line Company and G. H. Hagle, Trustee in Dissolution, against the United States of America for

recovery of federal income taxes and deficiency interest alleged to have been overpaid for the calendar year 1965 and for the period January 1, 1966 to November 22, 1966. The causes were consolidated for pretrial proceedings and trial following the transfer of Action No. 18,615–4 to this division under Local Rule 13. This Court has jurisdiction under 28 U.S.C. § 1346.

## FINDINGS OF FACT

The parties have entered into a lengthy stipulation and have presented evidence to the Court without a jury. The stipulation of fact and evidence presented reveals the following course of events. Plaintiff, Great Lakes Pipe Line Company (Great Lakes) was incorporated in the State of Delaware on July 17, 1930. During 1965 and up until November 22, 1966 it continued to be a corporation organized and existing under the laws of the State of Delaware with its principal office in Kansas City, Missouri. Great Lakes was a common carrier of refined petroleum products by pipeline operating in the states of Illinois, Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, Oklahoma, South Dakota, and Wisconsin. The entire authorized capital stock of the corporation consisted of 600,000 shares of common stock of which 411,669 shares were outstanding in 1965 and 1966 and owned by the following corporations in the listed percentages: Continental Oil Company, 29.18%; Sunray DX Oil Company, 18.96%; Skelly Leasing Company, 14.22%; Texaco, Incorporated, 12.14%; Union Oil Company of California, 9.48%; Sinclair Delaware Corporation, 5.88%; Orange State Oil Company, 5.15%; and Phillips Investment Company, 4.99%.

### The Executive Employment Contracts

In the latter part of 1964, the three majority stockholders of Great Lakes, Continental Oil, Sunray DX Oil, and Skelly Leasing, initiated plans to dispose of the assets of the Corporation. Further discussions regarding the proposed sale were had at the annual stockholders meeting in March of 1965. At that meeting, the plan to sell was made known for the first time to the management personnel of Great Lakes. On May 24, 1965, an announcement was made of an information meeting for prospective buyers to be held in New York on June 29, 1965. L. F. McCollum of Continental Oil, R. E. Foss of Sunray DX Oil, and Don Miller of Skelly Leasing comprised the executive committee of shareholders in charge of negotiating the proposed sale of the assets of Great Lakes.

Prior to the information meeting, in June of 1965, informal assurances were given to the president of Great Lakes, Richard L. Wagner, by representatives of the three majority stockholders. Mr. Wagner was assured that in the event of a sale of the assets of Great Lakes, he and the other key management personnel would be "taken care of" as far as employment was concerned. It was also stressed to Mr. Wagner that the majority stockholders were concerned with keeping the present management team intact to assure a smooth operation of the business pending any sale of assets, and in order to offer a purchaser an experienced management team. On July 14, 1965, the informal assurances given to Mr. Wagner were expressed at a meeting of representatives of the majority stockholders and key management personnel. The informal assurances were not reduced to writing except in the form of salary schedules given to the selected eight key executives of Great Lakes, Messrs. Wagner, Linsley, Welsh, Seck, Robb, Ryan, Springer, and Learmonth. This schedule set forth each executive's current salary for a five year period, and one-half of his current salary for the next five years, plus applicable fringe benefits until death or formal retirement. On July 16, 1965, this schedule was slightly modified to correct an error in computation and each of the named executives was presented with a new schedule. The schedules of July 14 and 16 given to the executives were not pre-

pared or signed by Great Lakes but were prepared and signed by representatives of Continental Oil and Sunray DX Oil, L. F. McCollum and R. E. Foss. The total amount of "salary assurances" reflected by the final schedule of July 16, 1965, was approximately $1,902,000.00. At this time it was understood that no amounts were to be paid under the "assurances" until and if the capital assets of Great Lakes were sold.

On November 30, 1965, Great Lakes entered into an agreement with Williams Brothers Pipe Line Company (Williams Brothers) for the sale of all assets of Great Lakes for the sum of 287.6 million dollars.[1] This purchase agreement made no mention of any "salary assurances" or employment contracts between Great Lakes and its executives, or between the stockholders of Great Lakes and its executives.[2]

The "assurances" which had been given to the eight key executives of Great Lakes on July 14 and 16, 1965 by the representatives of the three majority shareholders were adopted in substantially the same amounts by the Board of Directors of Great Lakes at a meeting on March 28, 1966, at 9:00 a. m. At that meeting, the chairman presented to the meeting a form of letter contract dated March 29, 1966 to be executed with Williams Brothers, and a form of letter contract dated March 29, 1966 to be executed with each of the eight key executives of Great Lakes who had previously been given assurances by the majority stockholders. Both of the letter contract forms related to the employment future of the eight executives. It was resolved by the Board that the president or any vice president of Great Lakes be authorized to execute and deliver these proposed contracts to Williams Brothers and each of the eight executives under date of March 29, 1966. The Board of Directors also discussed a proposal whereby the three majority stockholders were to agree to make funds available for the satisfaction of these proposed employment contracts to the extent the obligation of Great Lakes exceeded a certain amount.

At 1:00 p. m. on March 28, 1966, the Stockholders of Great Lakes held a special meeting wherein they, among other things, ratified the action of the Board of Directors in authorizing the execution of the contracts with the executives and with Williams Brothers concerning employment of the executives. This ratification was conditioned upon the execution of the "excess obligation" agreement by the three majority stockholders.[3] The "excess obligation" agreement which was presented to the stockholders at the meeting and subsequently executed under date of March 29, 1966, provided that the three majority stockholders would assume the liability of Great Lakes under the contracts to the extent it exceeded a certain amount.[4]

1. This amount was subject to certain adjustments and conditions not here relevant.

2. The agreement did state that "The Company [seller] agrees that, without first obtaining the written consent of the purchaser, prior to the Closing Date (a) the Company will not * * * enter into any employment contract with any of its directors or officers . . . ."

3. Apparently the minority stockholders were concerned with the amount potentially payable under the contracts by Great Lakes, and thus convinced the majority stockholders that they should bear most of the costs of an obligation which they had initiated through "salary assurances."

4. In pertinent part this agreement provided that the majority stockholders "agreed to make funds available for the satisfaction of the obligations with respect to the eight key employees to the extent that the obligation with respect to any such employee (including and amounts paid, either to such employee or to Williams by the Company in respect of settlement of its obligation to such employee) exceeds the aggregate amount paid or payable to such employee from the date on which he is placed on special leave of absence or his employment is terminated by Williams until March 29, 1968."

On March 29, 1966, the sales agreement between Great Lakes and Williams Brothers was finalized and the sale closed. Also, under date of March 29, 1966, the contracts between Great Lakes and the eight executives, and between Great Lakes and Williams Brothers, concerning the employment of the eight executives were executed. Under the terms of the contracts with the executives, no amounts were to be paid and the contracts were to have no effect until and if the assets of Great Lakes were sold. The executives agreed to accept employment with Williams Brothers if offered, and Great Lakes agreed to provide a guaranteed salary or employment or special leave of absence arrangement with Williams Brothers.[5] Under the terms of the contract with Williams Brothers, Williams agreed to employ the eight executives at present salary and position "for the time being." Further it was agreed that if Williams Brothers no longer desired the services of any of the executives, it would place him on special leave of absence and continue to pay his salary if Great Lakes would make arrangements to reimburse the expenses incurred.[6] The contracts reflected a potential

5. The contract with each of the eight executives provided in pertinent part as follows:

"This letter agreement with you is designed to implement the assurances given to you last summer with respect to your relationship with this company and any other company which might purchase its assets. In consideration of your agreement to accept employment with Williams Brothers Pipe Line Company ("Williams"), which Company is today acquiring our assets pursuant to agreement dated November 30, 1965, as amended, we hereby agree with you as follows:

"1. Your employment with us is hereby terminated, subject to Williams' employing you in your present position at your present salary, effective upon such termination.

"2. We hereby agree that we will use our best efforts to cause Williams to retain you as an employee of Williams for a period ending the earlier of (a) March 29, 1976, (b) your normal retirement date under the Great Lakes Retirement Annuity Plan as now in effect (which Williams has agreed to assume) or (c) the date of your death, total and permanent disability, retirement (including voluntary retirement) under the Great Lakes Retirement Annuity Plan, your resignation without just cause or your discharge for cause (which shall include incompetence or insubordination).

"3. During the period mentioned in paragraph 2 you shall be entitled to receive an annual salary of $———— [different as to each executive] through March 29, 1971, and thereafter an annual salary of $———— [different as to each executive] through March 29, 1976, plus all benefits to which you would have been entitled if you had remained a participant in the Retirement Annuity Plan until the end of the period mentioned in Paragraph 2 . . . .

"4. Williams has agreed with us by separate letter dated today, a copy of which has been given to you, that, if we shall make arrangements satisfactory to Williams to hold Williams harmless for any added cost and expense to which Williams may be put, Williams, in lieu of terminating your employment (except in the case of discharge for cause, including incompetence or insubordination), shall if it determines that your active services with Williams are no longer required, place you on special leave of absence without termination of employment status for the period ended as mentioned in Paragraph 2. During such period Williams has agreed that your annual salary referred to in paragraph 3 above will continue to be paid and you will continue to be entitled to the other benefits referred to in said paragraph, subject, however, to reduction as therein provided. During the continuance of such special leave of absence, you shall be entitled and encouraged to seek other active employment.

5. If, notwithstanding the foregoing, Williams shall terminate your employment prior to the expiration of the period mentioned in paragraph 2, . . . we shall be responsible for the payment directly to you of the salary and benefits mentioned in paragraph 3 . . . ."
\* \* \* \* \*

6. The contract concerning employment between Great Lakes and Williams Brothers provided in pertinent part as follows:

"We have today executed letters in the form of Schedule I hereto [form of executive contract] with each of the employees (the "Employees") of this Com-

obligation to the executives of approximately $1,902,000.[7]

Following the sale of Great Lakes' capital assets on March 29, 1966, the eight mentioned executives, whose active employment by Great Lakes had been terminated by the sale, were employed by Williams Brothers in their previous positions and at their former salaries. Williams Brothers was under

pany listed in Schedule II hereto providing for salary and other benefits to the employees as outlined in Schedule III hereto. You hereby agree with us with respect to the continued employment of the Employees by your company as follows:

"1. The employment of each of the Employees with us having terminated on the date of this letter, you hereby agree to employ each of the Employees at their present salaries and in their present positions as set forth in Schedule I, for the time being.

"2. If you determine that you do not require the active services of one or more of the Employees for reasons other than such as would give you the right to discharge for cause (which shall include incompetence or insubordination), you shall have the right to give us 30 days written notice that you do not require the active services of such Employee and if, prior to the expiration of the 30 day period, we shall not have made arrangements, satisfactory to you, to reimburse you for and hold you harmless against all expenses thereafter incurred by you in providing the benefits and payments referred to above with respect to such Employee, you shall have the right to discharge such Employee without further cost or expense to you. If, on the other hand, before the expiration of such period we shall have made such satisfactory arrangements, you agree that you will place such employee on special leave of absence without termination of employment status for the period mentioned in paragraph 2 of the letter in the form of Schedule I executed with such Employee and during such period you will continue to pay and make available to such Employee the salary and other benefits mentioned above. . . . "

\*     \*     \*     \*     \*

7. The obligations to the eight executives as shown in the contracts and schedules to the Williams Brothers contracts were as follows:

Annual Salary (1) and Benefits

| Name of Employee | Salary Through a Date 5 years after March 29, 1966 | Salary from 5 years after March 29, 1966 to Earlier of Normal Retirement (2) or 10 Years after March 29, 1966 | Other Benefits as a Percentage of Salary (3) |
|---|---|---|---|
| R. L. Wagner | $57,500 | $28,750 | 24.90% |
| Grey Linsley | $40,000 | $20,000 | 27.27% |
| G. A. Welsh | $32,000 | $16,000 | 23.82% |
| L. B. Seck | $28,000 | $14,000 | 27.26% |
| J. T. Robb | $25,000 | $12,500 | 25.05% |
| W. A. Ryan | $25,000 | $12,500 | 27.27% |
| L. F. Springer | $20,000 | $10,000 | 21.68% |
| R. H. Learmonth | $24,000 | $12,000 | 20.71% |

(1) Payable monthly, and subject in each case to deduction of amounts equal to the Employee's Monthly Contribution now required by the Retirement Annuity Plan for such annual salary.

(2) Determined in accordance with the Retirement Annuity Plan.

(3) All benefits to which the Employee would have been entitled if he had remained a participant in the Retirement Annuity Plan until the earlier of his normal retirement date or 10 years after March 29, 1966; and benefits not less favorable to the Employee than those now provided by Great Lakes under its Investment Plan, Disability and Disability Benefits Plans, Insured Salary Continuance Plan covering Long Term Disability, Group Life and Accidental Death and Dismemberment Insurance and Comprehensive Medical Expense Insurance.

no obligation to retain any of the executives in active employment, and in the latter part of April, 1966, Williams Brothers notified Great Lakes that it would no longer require the services of five of the executives.[8] Informal notice of the intent of Williams to terminate was given to the five executives early in May, 1966. At this point, representatives of the three majority stockholders of Great Lakes initiated efforts to persuade Williams Brothers to retain some of the five executives. These efforts were unsuccessful, and the representatives of the three majority stockholders of Great Lakes, in conjunction with Williams Brothers, entered discussions with the five executives to renegotiate the terms of the March 29th employment contracts between Great Lakes and the executives. There was, among other things, disagreement as to whether the five executives were under a duty to seek other employment when released from the active employment of Williams Brothers. And, understandably, the majority stockholders were concerned with the amount payable by them under the "excess obligation" agreement they had entered into with Great Lakes on March 29, 1966.[9] As a result of the renegotiations, informal agreements were reached. The five executives agreed to accept a lesser amount of salary and benefits in satisfaction of their March 29, contracts, and it was agreed that they were under no obligation to seek other employment when released by Williams. The new agreement in effect obligated Great Lakes to compensate the five executives for three full years salary and partial benefits. This new obligation was approximately $657,000.00.

On May 26, 1966, by a series of contracts between Great Lakes and Williams Brothers, and between Williams Brothers and the five executives, the new agreements with the five executives were formalized. This was accomplished by a written agreement between Great Lakes and Williams Brothers pursuant to paragraph 2 of their March 29, 1966 contract concerning employment, and by separate written agreements between Williams Brothers and each of the five executives.

Pursuant to paragraph 2 of their March 29 agreement, Great Lakes paid to Williams Brothers the sum of $650,000.-00 and Williams Brothers agreed to place the five executives on special leave of absence without termination of employment and to provide payments of salary and benefits to each in accordance with agreements between Williams Brothers and each of the five executives. It was agreed that the $650,000.00 paid by Great Lakes was sufficient to reimburse Williams Brothers in full for any obligations it incurred to the five employees. Concurrently with this agreement, Williams Brothers entered into separate agreements with each of the five executives. By these agreements, the five executives released Great Lakes and Williams Brothers from all claims and obligations arising out of the March 29, 1966 contracts. Williams Brothers agreed to place each of the five executives on special leave of absence as of March 31, 1966, in lieu of termination of employment, and to provide benefits and salary in accordance with a schedule attached to each contract. The five executives were under no obligation to

---

8. This notice was pursuant to paragraph 2 of the March 29, 1966 employment agreement between Great Lakes and Williams Brothers. Those employees to be terminated were Messrs. Wagner, Linsley, Seck, Ryan, and Learmonth.

9. The total potential obligation for salary and benefits to the five executives under the March 29 contracts from a termination date of May 31, 1966, was approxi-

mately $1,412,000.00. The amount due to the five from May 31, 1966, until March 29, 1968, was approximately $402,000.00. The amount due to the five from March 29, 1968, until the contracts expired was approximately $1,010,000.00. This latter amount the majority stockholders, Continental Oil, Sunray DX Oil, and Skelly Leasing, had agreed to satisfy by their "excess obligation" agreement of March 29, 1966.

seek other active employment, and amounts received from other employment would not in any way diminish the amounts due under the contracts.[10]

Although Great Lakes paid $650,000.00 to Williams Brothers for its assumption of the obligations to the five employees, there is no evidence that the three majority stockholders made any funds available to Great Lakes for the payment of any part of this amount as provided in the "excess obligation" agreement of March 29, 1966.

In its 1966 Income Tax Return, Great Lakes claimed a deduction of $650,000.00 for the payment made to Williams Brothers on May 26, 1966. This deduction was claimed as an ordinary and necessary business expense under Section 162, Internal Revenue Code of 1954. The deduction was disallowed on the grounds that it was a capital expense incurred in the sale of assets of Great Lakes and as such offset the amount of gain realized by Great Lakes on that sale.

*The Sale and Liquidation Expenses*

The stockholders of Great Lakes adopted a plan of complete liquidation on March 4, 1966 which met the requirements of Section 337 of the Internal Revenue Code. This Plan called for the sale of assets to Williams Brothers under the terms and conditions of the November 30, 1965 Purchase Agreement, as amended, and for dissolution of the Corporation and distribution of proceeds to the shareholders.

Expenses were incurred by Great Lakes in the amount of $144,199.31 in 1965 and in the amount of $243,901.30 in 1966 for legal fees, accounting fees, printing costs and miscellaneous expenses in accomplishing the sale and complete liquidation of Great Lakes. In its 1965 Income Tax Return, Great Lakes claimed a deduction in the amount of $144,199.31 under Section 162, Internal Revenue Code, as expenses of liquidation. This deduction was disallowed on the grounds that the expenses were non-deductible expenses incurred in the sale of Great Lakes' assets, and as such were capital expenses which offset the amount of gain realized by Great Lakes on the Sale. In its 1966 Income Tax Return, Great Lakes claimed a deduction in the amount of $382,905.61 as expenses of liquidation, and it also claimed a deduction of $60,768.73 as legal and auditing fees. The Government disallowed $372,905.61 of the claimed liquidation expenses and $15,195.00 of the claimed legal and auditing fees. This disallowance was on the grounds that the expenses were non-deductible capital expenses in-

---

10. Under the agreements with Williams Brothers, the five executives were to receive different amounts over different periods of time ranging from 3 to 10 years. Also, the payments were to cease on the death of the executive. Assuming all of the executives survived to collect fully, the total cost to Williams Brothers was as follows:

| | Salary | Benefits | Total |
|---|---|---|---|
| R. L. Wagner | $241,292.00 | $ 7,540.00 | $248,832.00 |
| Grey Linsley | $182,970.00 | $11,406.00 | $194,376.00 |
| L. B. Seck | $112,354.02 | $ 2,983.50 | $115,337.52 |
| W. A. Ryan | $102,729.00 | $ 5,335.00 | $108,064.00 |
| R. H. Learmonth | $100,227.65 | $ 5,399.23 | $105,626.88 |
| | | | $772,236.40 |

Presumably, because of the interest it would bear, the $650,000 was considered by Williams Brothers and Great Lakes sufficient to meet these obligations over a period of years.

The three executives retained by Williams Brothers, Messrs. Welsh, Robb, and Springer, were not parties to the May, 1966, negotiations or contracts, but retained their original contracts with Great Lakes. At the time of the suit, they had made no claim for payment under these contracts.

curred in Great Lakes' sale of assets.[11] In addition to these stipulated amounts, the Court received evidence stipulated to represent the "expense of liquidation or selling the Great Lakes Pipeline system," This evidence reveals numerous expenses relating to the sale of Great Lakes' assets. The plaintiff presented no evidence on the question of whether any of the stipulated expenses were expenses not relating to the sale of assets.

### ISSUES TO BE DECIDED

The original pleadings in this cause raised numerous legal and factual issues. However, settlement and compromise negotiations have disposed of all but two of the original issues. There remains to be determined the following:

(1) Whether the sums of $144,199.31 and $243,901.30 which are claimed by Great Lakes to be deductible as expenses of liquidation are deductible by Great Lakes under Section 162 of the Internal Revenue Code of 1954, or whether they are nondeductible capital expenditures incurred by Great Lakes in connection with the sale of its pipeline system to Williams Brothers.

(2) Whether the $650,000.00 paid by Great Lakes to Williams Brothers Pipe Line Company on May 26, 1966, in accordance with the agreement for Williams Brothers to assume liabilities to the five executive officers was deductible under Section 162 of the Internal Revenue Code of 1954.

### CONCLUSIONS OF LAW

It is undisputed that due to the applicability of Section 337 of the Internal Revenue Code, the approximately $200,000,000.00 net gain realized by Great Lakes Pipe Line Company upon the sale of its assets was for the most part not taxable to the corporation.[12] Rather, the gain resulting therefrom was transferred to and taxed against the distributee shareholders.

■ The statutory provisions under which the plaintiffs claim deductions, Section 162 of the Internal Revenue Code (26 U.S.C. § 162), provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *." It is firmly established that if an expense is "capital" it cannot be deducted as an "ordinary and necessary" business expense under Section 162 of the Code. Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); see Commissioner of Internal Revenue v. Lincoln Savings and Loan Ass'n, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); Helgerson v. United States, 426 F.2d 1293 (8th Cir. 1970).

■ Generally, the costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures. Woodward v. Commissioner of Internal Revenue, supra; Helgerson v. United States, supra, and cases cited therein; see Spreckels v. Commissioner of Internal Revenue, 315 U.S. 626, 62

---

11. The $144,199.31 claimed in 1965 was also claimed in 1966 as part of the $382,905.61. Plaintiff concedes that it should not be allowed a deduction in both 1965 and 1966 for the $144,199.31 claimed in both years. Thus the expenses in dispute are the $144,199.31 incurred in 1965 and the $243,901.30 ($372,905.61 less $144,199.31 plus $15,195.00) incurred in 1966.

12. Section 337, Internal Revenue Code, (26 U.S.C. § 337) provides in pertinent part:

(a) General Rule.—If—
 (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
 (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

S.Ct. 777, 86 L.Ed. 1073 (1942). These costs are added to or subtracted from the basis of the assets in computing the gain or loss realized on the sale or purchase. See Spreckles v. Commissioner of Internal Revenue, supra. The Eighth Circuit Court of Appeals has indicated that this general rule is applicable to costs incurred in connection with the sale of capital assets under a plan of complete liquidation pursuant to Section 337 of the Internal Revenue Code. United States v. Morton, 387 F.2d 441 (8th Cir. 1968).[13]

In reaching this conclusion, the Court in *Morton*, 387 F.2d at 449, stated as follows:

> To allow what ordinarily is considered as a capital expenditure in the sale of a capital asset or the collection of insurance proceeds producing a capital gain as an ordinary business expense is thwarting and overextending the congressional purpose in enacting § 337. This remedial legislation had for its purpose the removing of the spector of double taxation assessed on technicalities in corporate liquidations. This purpose was achieved by eliminating any corporate tax on any gain or loss resulting from the sale or exchange of corporate assets in a qualifying plan of complete corporate liquidation and shifting the tax consequences to the distributee stockholders; thus treating the whole transaction of liquidation as though a distribution in kind has been made to the stockholders and the sale or exchange of the assets then made by the stockholders. Under the procedure of the stockholders selling the corporate assets after distribution in kind the usual legal and selling expenses in con-

nection with a sale would be considered as capital expenses chargeable against the sale proceeds. We do not think Congress intended any preference to distributee shareholders of liquidating corporations other than the elimination of double taxation; nor do we think Congress intended to change the prevailing accounting principle of treating capital expenditures as chargeable only against capital gains or losses.

■ Those expenses incurred in a corporate dissolution and liquidation apart from the costs incurred in connection with the sale of assets are fully deductible as ordinary and necessary business expenses under Section 162, Internal Revenue Code. Gravois Planing Mill Co. v. Commissioner of Internal Revenue, 299 F.2d 199 (8th Cir. 1962); Pacific Coast Biscuit Co., 1935, 32 B.T.A. 39, 42–43; Commissioner of Internal Revenue v. Wayne Coal Mining Co., 209 F.2d 152 (3d Cir. 1954); United States v. Arcade Company, 203 F.2d 230 (6th Cir. 1953). The theory most frequently advanced for this conclusion is that expenditures of liquidation do not concern the creation or continuance of a capital asset. Gravios Planing Mill Co. v. Commissioner of Internal Revenue, supra.

Plaintiffs contend that because of the adoption of a plan of complete liquidation, the costs incurred by Great Lakes in connection with the sale of its assets pursuant to this plan are "expenses of liquidation" deductible under Section 162 of the Code. Reliance is placed primarily upon the cases of Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35 (4th Cir. 1965) and United States v. Mountain States Mixed Feed

---

13. The Circuits are split on the issue of whether costs incident to the sale of assets in a Section 337 complete liquidation can be deducted as ordinary and necessary business expenses under Section 162 of the Code. The 4th and 10th Circuits have held such expenses properly deductible. Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35 (4th Cir. 1965); United States v. Mountain States Mixed Feed Co., 365 F.2d 244

(10th Cir. 1966). The 3rd, 6th, 7th, and 8th Circuits have held such expenses capital and nondeductible. Connery v. United States, 460 F.2d 1130 (3d Cir. 1972); Lanrao v. United States, 422 F. 2d 481 (6th Cir. 1970); Alphaco, Inc. v. Nelson, 385 F.2d 244 (7th Cir. 1967); United States v. Morton, 387 F.2d 441 (8th Cir. 1968). See Towanda Textiles, Inc. v. United States, 180 F.Supp. 373, 149 Ct.Cl. 123 (1960).

Co., 365 F.2d 244 (10th Cir. 1966), United States v. General Bankshares Corp., 388 F.2d 184 (8th Cir. 1968), and Gravois Planing Mill Co. v. Commissioner of Internal Revenue, 299 F.2d 199 (8th Cir. 1962). This contention is without merit in light of the decision in United States v. Morton, supra, and in light of the distinguishing features of the decisions in Gravois Planing Mill Co. and General Bankshares Corp. In Morton the Eighth Circuit Court of Appeals rejected the holdings in Pridemark and Mountain States Mixed Feed, and adopted the position taken by the Seventh Circuit in Alphaco, Inc. v. Nelson, 385 F.2d 244 (7th Cir. 1967), that expenses incurred in producing a capital gain in connection with a Section 337 complete liquidation are capital expenses chargeable against capital gain realized. The Court in Morton distinguished Gravois Planing Mill Co. on the grounds that it dealt with the treatment of expenses of partial liquidation in that situation where partial liquidation is the dominant aspect of a corporate reorganization of its capital structure. The case of United States v. General Bankshares Corp. can be distinguished from the instant case on the same grounds. That case involved corporate divestment of assets in partial liquidation, and followed the decision and test of Gravois Mills in looking to the "dominant aspect" of a corporate divestment to determine if the expenses incurred are deductible expenses of partial liquidation or nondeductible expenses of reorganization.[14] This is not the question involved in the instant case, and thus the applicable law is that established for this Circuit in Morton.

In accordance with the decision in Morton, those expenses incurred by Great Lakes in connection with the disposition of its capital assets on March 29, 1966, are capital expenses that are chargeable against and serve to reduce the capital gain realized on the sale of corporate assets and not deductible under Section 162 of the Internal Revenue Code.

### The Character of the $144,199.31 and $243,901.30 expenses incurred by Great Lakes in 1965 and 1966

The inquiry now directs itself to the question of whether the $144,199.31 and $243,901.30 expenses incurred by Great Lakes for legal fees, accounting fees, printing costs and miscellaneous costs in 1965 and 1966 were expenses incurred by Great Lakes in connection with the sale of its capital assets. In taking the position that all of the expenses in issue were deductible expenses of liquidation, plaintiffs have not endeavored to show that any part of the stipulated expenses were incurred exclusively in connection with the corporate liquidation and dissolution as opposed to the sale or transfer of corporate assets. It is formally stipulated that these expenses were incurred "in accomplishing the sale and complete liquidation of Great Lakes," and at the trial of this cause it was stipulated that plaintiff's Exhibit No. 4 represented the "expenses of liquidation or selling the Great Lakes' pipeline system." This exhibit reflects expenses of $276,035.45 directly relating to the sale of Great Lakes' assets.[15] This amount varies considerably from the amount which has been stipulated to have been incurred by Great Lakes in

---

14. The Court in United States v. General Bankshares Corp., 388 F.2d at 191 stated :
    "We do not purport to hold that any distribution of corporate assets pursuant to any and all corporate transactions is entitled to consideration under the Gravois test to determine its character, or even its dominant purpose."
    Significantly, General Bankshares did not involve a sale or transfer of capital assets that entailed an immediate tax consequence.

15. Exhibit 4 reflects the following:

| | |
|---|---|
| Printing Costs | $ 43,433.18 |
| Accountants' fees | $ 84,400.00 |
| Legal fees and expenses | $128,531.28 |
| Travel costs and misc. | $ 19,670.00 |
| Total | $276,035.45 |

accomplishing the sale and complete liquidation in 1965 and 1966, and which has been disallowed by the defendant. Plaintiffs have failed to present any evidence showing that any portion of the expenses stipulated to have been incurred were something other than capital expenditures. Where a deduction has been disallowed, the burden rests with the taxpayer to demonstrate that the claimed deduction is proper. Wells-Lee v. Commissioner of Internal Revenue, 360 F.2d 665, 669 (8th Cir. 1966); Dyer v. Commissioner of Internal Revenue, 352 F.2d 948 (8th Cir. 1965); Green v. Bookwalter, 319 F.2d 631 (8th Cir. 1963); Five Lakes Outing Club v. United States, 468 F.2d 443 (8th Cir. 1972); 4A Mertens, Law of Federal Income Taxation, § 25.20, p. 102. Plaintiffs have failed to carry this burden of proof.

■ In light of the evidence and stipulations presented, the Court finds that the $144,199.31 and $243,901.30 costs incurred by Great Lakes for legal fees, accounting costs, printing costs and miscellaneous costs in 1965 and 1966 were incurred in connection with and directly related to the sale of capital assets on March 29, 1966. Thus these costs were capital expenditures chargeable against the capital gain realized on the sale of corporate assets by Great Lakes. United States v. Morton, supra. Defendant properly determined that these expenditures were not deductible as ordinary and necessary business expenses under Section 162 of the Internal Revenue Code of 1954.

### Great Lakes' $650,000 payment to Williams Brothers on May 26, 1966

Plaintiffs contend that the $650,000.00 payment to Williams Brothers on May 26, 1966, in settlement of Great Lakes' obligations to the five executives was an "ordinary and necessary" business expense currently deductible under Section 162 of the Internal Revenue Code. They assert the employment contracts executed on March 29, 1966 were entered in June, 1965, so that Great Lakes could continue to be profitably operated during sale negotiations and that the payment to Williams Brothers on May 26, 1966, was made to secure release from onerous business contracts. Plaintiffs argue that a payment of this type is clearly an ordinary and necessary business expense deductible under Section 162 of the Code. Reliance is placed on the following cases: Metropolitan Company v. United States, 176 F.Supp. 195 (S.D. Ohio 1959); Darlington-Hartsville Coca-Cola Bottling Co. v. United States, 273 F.Supp. 229 (D.C.S.C.1967); Stuart Co. v. Commissioner of Internal Revenue, 9 T.C.M. 585, aff. per curiam, 195 F.2d 176 (9th Cir. 1952); Cleveland Allerton Hotel, Inc. v. Commissioner of Internal Revenue, 166 F.2d 805 (6th Cir. 1948).

The Government contends the contracts were not entered into by Great Lakes until March 29, 1966; that the contracts were contingent upon and an integral part of the sale of Great Lakes' assets to Williams Brothers; and that the contracts had their origin in the sale of Great Lakes' assets. Therefore, the Government asserts the $650,000 payment to Williams Brothers was an expense "incurred in" the sale of assets and as such it is a nondeductible capital expenditure. Alternatively, the Government contends that the $650,000 payment represents only a reduction in the amount of the net sales proceeds realized by Great Lakes on its sale of assets and ultimately available for distribution to the shareholders.[16] In support of its contentions, the Government relies primarily upon the cases of Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), aff'g 410 F.2d 313 (8th Cir. 1970); Anchor Coupling Co. v. United States, 427 F.2d 429 (7th Cir. 1970), cert. den., 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971);

16. Either of these contentions reaches the same result of reduction by $650,000 the amount of gain realized by Great Lakes on its sale of assets, and the disallowance of the Section 162 deduction from ordinary income.

and United States v. Morton, 387 F.2d 441 (8th Cir. 1968).

Generally, to qualify as a deduction under Section 162 of the Internal Revenue Code of 1954, an item must (1) be "paid or incurred during the taxable year," (2) be for "carrying on any trade or business," (3) be an "expense," (4) be a "necessary" expense, and (5) be an "ordinary" expense. Commissioner of Internal Revenue v. Lincoln Savings and Loan Ass'n, 403 U.S. 345, 19 S.Ct. 1893, 29 L.Ed.2d 519 (1971). These requirements have been explicated in numerous cases. See, for example, Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938); Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943); Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); Woodward v. Commissioner of Internal Revenue, supra; United States v. Hilton Hotels Corp., 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); Commissioner of Internal Revenue v. Lincoln Savings & Loan Ass'n, supra; Woodward v. Commissioner of Internal Revenue, 410 F.2d 313 (8th Cir. 1970), aff'd 397 U.S. 572, 90 S.Ct. 1302, 25 L. Ed.2d 577 (1970); Helgerson v. United States, 426 F.2d 1293 (8th Cir. 1970).

In the instant suit, there is no dispute that the $650,000 payment was made during the taxable year 1966. The principle dispute is whether the payment was an "ordinary and necessary expense," paid in "carrying on any trade or business," within the meaning of Section 162 of the Code. The determination of whether an expenditure is ordinary and necessary requires an analysis of the transaction in which the expenditure occurred. As stated in Welch v. Helvering, supra, 290 U.S. at 115, 54 S.Ct. at 9: "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." The Supreme Court has further stated that: "The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures . . . ." Commissioner of Internal Revenue v. Tellier, supra, 383 U.S. at 689, 86 S.Ct. at 1120. And, "Our decisions have consistently construed the term 'necessary' as imposing only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business.'" Commissioner of Internal Revenue v. Tellier, supra, 383 U. S. at 689, 86 S.Ct. at 1120, quoting Welch v. Helvering, supra, 290 U.S. at 113, 54 S.Ct. 8, 78 L.Ed. 212.

The initial inquiry, therefore, must be whether the $650,000 expenditure here involved was a capital expenditure; that is whether it was a cost incurred in the disposition of a capital asset. See Woodward v. Commissioner of Internal Revenue, supra; Spreckels v. Commissioner of Internal Revenue, supra; Helgerson v. United States, supra; United States v. Morton, supra. In the recent case of Woodward v. Commissioner of Internal Revenue, the Supreme Court determined that the deductibility of litigation expenses depends upon the origin of the claim or the nature of the transaction out of which the suit arose. In *Woodward*, the Court declared:

"Since the inception of the present income tax in 1913, capital expenditures have not been deductible [citations omitted]. Such expenditures are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the asset is sold. If an expense is capital, it cannot be deducted as 'ordinary and necessary,' either as a business expense

under § 162 of the Code or as an expense of 'management, conservation, or maintenance' under § 212 [footnote omitted]."

Although the expenditure in issue in the instant cause is not the same as those involved in *Woodward*, the Court is convinced that the similarities justify treatment of the expenditure as was done in *Woodward*. That is in determining whether the payment of the obligation was a capital expenditure, the Court looks to the origin of the obligation and the nature of the transaction out of which it arose. See Deputy v. Dupont, supra; Helgerson v. United States, supra; Iowa Southern Utilities Company v. Commissioner of Internal Revenue, 333 F.2d 382 (8th Cir. 1964); Anchor Coupling Company v. United States, 427 F.2d 429 (7th Cir. 1972); DeMink v. United States, 448 F.2d 867 (9th Cir. 1971); Munn v. United States, 455 F.2d 1028 (Ct.Cl.1972); Plym v. United States, 338 F.Supp. 717 (W.D.Mich.1971).

■ When this test is applied to the facts in the instant case, it is evident that the Government was correct in denying the $650,000.00 deduction claimed by Great Lakes in 1966. The obligation paid by Great Lakes on May 26, 1966 had its origin in and arose directly from Great Lakes' sale of assets on March 29, 1966, and thus was properly characterized as a capital expenditure. This conclusion is supported by the nature of the March 29, 1966 employment contracts, the circumstances which caused them to be executed by Great Lakes, their relation to the sales transaction, and the assumption of the contract obligations by the purchaser.

The stipulations and evidence clearly show that the employment contracts which gave rise to Great Lakes payment of $650,000 to Williams Brothers were executed on March 29, 1966, the same day as the closing of the sale transaction. The contracts with the executives were accompanied by a corresponding contract with the purchaser of Great Lakes' assets, Williams Brothers. This contract with Williams Brothers incorporated by reference the executive contracts and the amounts due under them. The contracts with the executives and with Williams Brothers were wholly contingent upon the sale of assets being accomplished, and without a sale of Great Lakes' assets, the contracts were to have no effect on the employment arrangement or salary of the eight Great Lakes' executives. The executives were to receive no payments if they were not willing to go to work for the purchaser. The contracts and circumstances surrounding their execution clearly reveal that it was anticipated that Williams Brothers would eventually assume Great Lakes' obligations to any executives who became eligible for payments under the employment contracts, and that Great Lakes would make payment to Williams Brothers for this assumption. This arrangement is expressly provided in the March 29th contracts in paragraph 4 of the executives' contracts and in paragraph 2 of the Williams Brothers' contract. The wording of the March 29, 1966 "excess obligation" agreement between Great Lakes and the three majority shareholders indicates that it was anticipated that Williams would take over Great Lakes' obligations to the executives which Williams Brothers determined not to retain in active employment. Furthermore, an integral part of the obligation created by the contracts was the continuation of employee benefits under plans which were, as part of the sales transaction, assumed and adopted by Williams Brothers.

Prior to the sale of assets, Great Lakes had no employment contracts with its executives, and testimony established that this type of contract was not common in the pipeline industry. The contracts with the executives of Great Lakes were executed at the time of the sale, in connection with the sale, and were an integral part of the transaction whereby Great Lakes disposed of all of its capital assets. The obligation incurred by Great Lakes and the payment made to Williams Brothers in satisfaction of this obligation had its origin in,

and was directly related to Great Lakes' disposition of capital assets. As such the $650,000 expenditure was a nondeductible capital expenditure.[17] In light of this conclusion, plaintiffs' contention that the expenditure was to secure release from onerous contracts and therefore deductible is without merit. Darlington-Hartsville Coca-Cola Bottling Company v. United States, 273 F.Supp. 229 (D.C.S.C.1967).

Accordingly, for the reasons stated, judgment is hereby entered in favor of the defendant, the United States of America, and costs are taxed against the plaintiffs.

It is so ordered.

17. The Court having found that the expenditure was not "ordinary" within the meaning of § 162, it is not necessary to consider the question of whether the expenditure was "necessary" within the meaning of that statute. However, the evidence indicates that the primary motivation behind the executive contracts was to recognize the executives' past contribution to Great Lakes, and to assure their willingness to work for the purchaser. It does not appear that the contracts entered on the date of sale could result or were intended to result in the inurement of a business benefit. See Allen Industries v. Commissioner of Internal Revenue, 414 F.2d 983 (6th Cir. 1969), and cases cited therein.