FERRIS F. BOOTHE AND DOROTHY S. BOOTHE, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20904–81.    Filed May 24, 1984.

Ferris F. Boothe, pro se.
*David M. Kirsch* and *Gerald W. Douglas*, for the respondent.

OPINION

GOFFE, *Judge*: The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1977 in the amount of $4,492.18. This matter is before us on respondent's motion for summary judgment. The facts are undisputed, petitioners' having admitted the facts contained in respondent's first request for admissions. The sole issue to be decided is whether a judgment for damages and costs which petitioners paid in 1977 is deductible as a theft loss under section 165(c) or a capital loss under section 165(f).[1]

Petitioners, husband and wife, filed a joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center at Ogden, Utah. They resided in Portland, Oreg., when they filed their petition.

In 1977, petitioner Ferris F. Boothe[2] paid a judgment of $20,000 in damages and $792.25 in court costs rendered against him. The judgment arose from his sale, in 1960, of Soldier's Additional Homestead Rights (hereinafter referred to as the rights). Petitioners claimed the $20,000 (less the first $100 not allowable) payment as a theft loss and the $792.25 as a miscellaneous deduction. The Commissioner, in the statutory notice of deficiency, disallowed the deductions but allowed $20,792 as a long-term capital loss on the ground that petitioners failed to establish that a theft occurred or that a deductible loss was sustained in 1977.

The rights which gave rise to the litigation against petitioner were granted to certain soldiers who served during the Civil War who had homesteaded land. Sec. 2306, U.S. Rev. Stat. The rights are freely assignable and permit the holder to apply for and to receive a fee interest in certain Federal lands. In 1958, a central registration for these rights was first established and "scrip abstracts" reflecting chain of title were gradually prepared 5 or 6 years subsequent to establishment of the central registration.

William H. Dooley, Jr., served as a soldier in the Civil War in Company "I" of the 18th Missouri Infantry from December 9, 1864, to June 18, 1865, and by reason of his homestead in

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during 1977.

[2] "Petitioner" will hereinafter refer to petitioner Ferris F. Boothe.

Arkansas became entitled to apply for rights to 120 acres under section 2306, U.S. Rev. Stat. In 1873, Dooley perfected his rights by filing the appropriate application with the U.S. General Land Office.

On September 28, 1898, Dooley assigned his rights to acquire 120 acres to Lewis C. Black. On April 29, 1916, Dooley again sold his rights to acquire 120 acres to B. A. Mason in three separate assignments, conferring the right to acquire 40 acres each. These assignments were executed in the State of Arkansas.

On April 6, 1951, B. A. Mason sold the right to acquire 40 acres of the rights he acquired from Dooley to Ad Given Davis, who died on November 11, 1956. Petitioner purchased the rights to acquire 40 acres from Davis' estate for $4,400 on April 27, 1959. The assignment contained the following provision:

in the event the Bureau of Land Management of the United States Department of the Interior refuses to validate the aforesaid right as valid and useable for the acquisition of public land under and pursuant to [applicable statutes], then upon re-assignment by assignee revesting title thereto in assignor, assignor shall refund the purchase price paid therefor in full to assignee; provided, that notice is furnished and said right is tendered back to assignor by assignee not later than December 31, 1959.

On June 30, 1960, petitioner sold his interest in the rights to 40 acres to R. L. Spoo for $8,000 who designated as the assignee William N. McDonald Co. Petitioners reported gain from the sale of the rights as long-term capital gain. Prior to the sale, petitioner sought to exercise the rights in the State of Washington but was unable to do so because the Federal lands he desired were not available for entry based upon the rights he held. At the time he sold the rights, however, petitioner had no notice or knowledge of the validity or invalidity of the rights.

The assignee of petitioner's rights changed its name to Metropolitan Mortgage & Security Co. and assigned the rights to Douglas Land Co. which first sought to exercise the rights on land in Nevada. The Bureau of Land Management held that such land was not subject to entry by these rights but that the rights themselves were valid.

Douglas Land Co. then sought to exercise its rights to land in Oregon, and the Bureau of Land Management held the rights

to be invalid based upon the earlier assignment of them from Dooley to Black. Litigation against petitioner for breach of warranty of title ensued which resulted in a judgment of $20,000 in damages and $792.25 in court costs being awarded against petitioner. The judgment against petitioner paid the judgment to R. L. Spoo, on October 26, 1977.

Petitioners contend that they sustained a theft loss under the law of Arkansas, and respondent contends that petitioner was not the victim of a theft and, therefore, not entitled to a deduction for theft loss.

The deductions claimed by petitioners were for a judgment of damages and court costs. The inquiry as to the character of the deduction should, therefore, focus upon the nature of the litigation. Where litigation involves the acquisition or disposition of capital assets, the origin and character of the claim is the controlling test. *Woodward v. Commissioner*, 397 U.S. 572 (1970); *United States v. Hilton Hotels Corp.*, 397 U.S. 580 (1970). The cost of defending or perfecting title to property is a capital expenditure. Sec. 1.263(a)-2, Income Tax Regs. Although most of the cases involving this issue relate to deductibility under section 162 or section 212, there is no reason why the test should not be applied to a deduction claimed under section 165.

The application of the origin-of-the-claim test in *Woodward* and *Hilton* must consider "the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all the facts pertaining to the controversy." *Boagni v. Commissioner*, 59 T.C. 708, 713 (1973); *Estate of Baier v. Commissioner*, 63 T.C. 513, 520 (1975), affd. 533 F.2d 117 (3d Cir. 1976).

> Quite plainly, the "origin-of-the claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. [*Boagni v. Commissioner, supra* at 713; fn. ref. omitted.]

It is undisputed that the litigation arose from petitioner's sale of his rights to R. L. Spoo. The legal action was instituted against petitioner because the rights which he purported to convey were invalid and worthless. If petitioner had not

attempted to sell the rights, the litigation would not have ensued. The issue in the litigation was whether petitioner was liable for damages in conveying title to the rights which title he did not possess. We recognize that the defect in title was occasioned by a probable fraud perpetrated against petitioner's predecessor in title, yet, in the litigation, petitioner was defending himself against an alleged breach of his warranty of title to Mr. Spoo. The origin-of-the-claim test is applicable to the disposition of property as well as the acquisition of property. *Helgerson v. United States*, 426 F.2d 1293, 1297 (8th Cir. 1970).

In *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952), the taxpayers received payments in liquidation of their corporation. Subsequent to reporting capital gains from the liquidation, a judgment was rendered against the corporation which judgment petitioners paid. The Supreme Court held that the payments by the taxpayers were allowable only as capital losses because they arose from the earlier capital transaction. We conclude that the principle of *Arrowsmith* applies here.[3]

In *Shannonhouse v. Commissioner*, 21 T.C. 422 (1953), the taxpayers purchased real property and buildings which they subsequently sold. It was later discovered that one of the buildings encroached upon adjoining property of a third person. The purchasers of the property from the taxpayers spent $3,331.50 to relocate the building for which the taxpayers reimbursed them to be relieved of further liability for breach of warranty of title. We held that the reimbursement by the taxpayers was capital in nature, being an outgrowth of the sale of the property by the taxpayers. In the instant case, petitioner purchased a bundle of rights from the Davis estate. He sold those rights, albeit invalid as they were. The judgment and costs which petitioner paid in 1977 resulted from the sale of rights which were defective.

In principle, we find *Shannonhouse* to be indistinguishable. Moreover, in *Rees Blow Pipe Manufacturing Co. v. Commissioner*, 41 T.C. 598 (1964), affd. 342 F.2d 990 (9th Cir. 1965), our reliance upon *Shannonhouse* and *Arrowsmith* in holding that judgments and court costs were capital in nature when they relate to the sale of a capital asset was specifically approved.

---

[3]*Kisska v. Commissioner*, T.C. Memo. 1981-655; *Clay v. Commissioner*, T.C. Memo. 1981-375.

We, accordingly, hold that the judgment and court costs paid by petitioner in 1977 are allowable as a long-term capital loss. In view of our holding based upon the origin-of-the-claim test, it is unnecessary for us to decide whether a taxpayer who is not the direct victim of a theft is entitled to deduct a theft loss.

*An appropriate order and decision will be entered.*

Reviewed by the Court.

DAWSON, SIMPSON, STERRETT, WILES, PARKER, SHIELDS, COHEN, SWIFT, and JACOBS, *JJ.*, agree with the majority opinion.

---

KÖRNER, *J.*, dissenting: I find that I must dissent from the majority opinion in this case, while at the same time being unable to agree with Judge Hamblen's dissenting opinion. This results from my view that both the majority and Judge Hamblen have taken an overly simplistic view of the facts which are presented in this case, as well as the applicable law, by telescoping the relevant events which occurred here, so as to produce a single transaction giving rise to a deductible loss, rather than two distinct and separable events having different tax consequences. As the result of taking this foreshortened view of the facts and legal principles involved, the majority arrives at conclusions which are completely irreconcilable with the conclusions expressed in Judge Hamblen's dissent, although both sides were viewing the identical set of facts. Thus, it appears to me that the majority opinion is correct in part, and Judge Hamblen's opinion is also correct in part, but a complete and correct solution to the instant problem can only be achieved by applying their solutions separately to the parts of the problem which they addressed.

Analyzing the problem chronologically, and separating it into its two component parts, I agree with Judge Hamblen's analysis of section 165(a) and (e), and his conclusion that this

petitioner was the victim of a loss arising from theft, even though he was not the immediate purchaser from the fraudulent vendor, Dooley; that his loss, and the cause therefor, was not discovered until the lawsuit against petitioner by Mr. Spoo was concluded by judgment in 1977; and that he was therefore entitled to a theft loss deduction in that year under section 165(a).

Section 165(b), however, clearly provides that—

For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

The agreed facts are that petitioner paid $4,400 for his nonexistent rights, and this was therefore his cost basis. He sold those "rights" in 1960 for $8,000 but, as the result of the litigation concluded in 1977, he had to refund that $8,000 as part of the overall judgment against him of $20,792, so that his original cost basis was then restored. I would therefore hold that he suffered a theft loss in 1959, when he purchased the nonexistent rights, in the amount of $4,400, which, not being discovered until 1977, was deductible by him in that year under section 165(e), subject to the limiting provisions of section 165(c)(3).[1]

To this extent, then, I agree with Judge Hamblen's dissent, but I cannot agree that the mantle of section 165 can be extended to cover the further loss which petitioner incurred as the result of the judgement rendered against him in 1977, arising out of an entirely separate transaction.

This brings me to the part of the problem on which the majority focused exclusively. When the assignee of petitioner's vendee sought to exercise the land rights involved herein, and was rejected, petitioner was sued for breach of warranty of title and, as the result of losing that lawsuit, petitioner had to pay a judgment and incidental costs of $20,792. I agree with the majority that the "origin-of-the-claim" test is applicable here; that the nature of the claim was with respect to petitioner's title to the property sold, and that the result of this litigation was that petitioner incurred a capital loss. I

---

[1]As in effect in 1977, sec. 165(c) (3) provided that casualty losses, including theft losses, were allowable as deductions only to the extent such losses excluded $100.

disagree with the majority, however, as to the amount of that loss.

Contained within the total judgment which petitioner had to pay was obviously a refund of the $8,000 purchase price which he had obtained when he sold his alleged rights to Mr. Spoo in 1960.[2] To the extent that petitioner's cost basis was thus restored, he is entitled to a theft loss, as I have indicated above, and such amount must therefore be carved out in computing the amount of capital loss to which he is entitled. A further adjustment would appear to be required for the fact that petitioner apparently reported for tax purposes the $3,600 gain which he thought he had upon the "sale" of his nonexistent rights to Mr. Spoo in 1960 for $8,000 ($8,000 − $4,400 = $3,600). This correction of the prior erroneous reporting should be allowed to petitioner for 1977 as part of the overall computation of his long-term capital loss under the provisions of section 1341 (involving the recomputation of tax where the taxpayer restores a substantial amount theretofore held under claim of right). I would accordingly recompute the nature and amount of petitioner's losses in accordance with the following:

|  | Petitioner paid out | Petitioner received |
|---|---|---|
| Original cost of rights | $4,400 | |
| Petitioner's sales proceeds | | $8,000 |
| Judgment and costs paid by petitioner | 20,792 | |
| Totals | 25,192 | 8,000 |
| Less amount received | 8,000 | |
| Petitioner's net out-of-pocket loss | 17,192 | |
| Less theft loss allowable | 4,400 | |
| Balance | 12,792 | |
| Long-term capital gain previously reported | 3,600 | |
| Long-term capital loss | 16,392 | |

---

[2]Such amount would not be part of the plaintiff's "damages" for petitioner's breach of his warranty of title. Even absent any warranty of title, the $8,000 purchase price could presumably have been recovered from petitioner by the plaintiff on the ground of failure of consideration.

In this fashion, and only in this fashion, is petitioner made whole for his two distinct types of loss as permitted by the Code, without any duplication of deductions and without omitting any deduction to which he is legitimately entitled.

I would accordingly allow petitioner a theft loss of $4,400, subject to the limitations of section 165(c)(3), and I would further allow him a long-term capital loss of $16,392, subject to the provisions of subchapter P, all for the year 1977.

WHITAKER, J., agrees with this dissent.

---

HAMBLEN, J., dissenting: I disagree with the majority opinion, both in its application of the "origin-of-the-claim" rule and in its resulting conclusion that we need not decide whether a taxpayer who is not the direct victim of a theft is entitled to deduct a theft loss. Instead, for the reasons set forth below, I would not extend the origin-of-the-claim rule to encompass the instant situation. Furthermore, I would consider the principal question now sidestepped by the majority, and would resolve the victim proximity issue in favor of petitioner.

The majority recognizes that the origin-of-the-claim rule has generally been applied in cases involving deductibility under section 162 or section 212. Almost cavalierly, the majority expands the purview of this judicial rule with the conclusion that "there is no reason why the test should not be applied to a deduction claimed under section 165." I disagree, and I see several reasons to resist such expansion.

First of all, the history of the doctrine itself does not support its inroad into section 165. The origin-of-the claim test originally developed under section 212 as a means to avoid the conversion of personal expenses into expenses incurred in connection with profit-oriented activities. See *Bingham's Trust v. Commissioner*, 325 U.S. 365 (1945); *Lykes v. Commissioner*, 343 U.S. 118 (1952). Examining such cases and enunciating the origin-of-the-claim principle, the Supreme Court explained:

> The principle we derive from these cases is that the characterization, as "business" or "personal", of the litigation costs of resisting a claim depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities. It does not depend on the *consequences* that might result to a taxpayer's income-producing property from a failure to defeat the claim,

for, as Lykes teaches, that "would carry us too far" and would not be compatible with the basic lines of expense deductibility drawn by Congress. * * * [*United States v. Gilmore*, 372 U.S. 39, 48 (1963). Emphasis in original. Fn. ref. omitted.]

Both *Gilmore* and its companion case, *United States v. Patrick*, 372 U.S. 53 (1963), involved legal expenses incurred in divorce proceedings wherein income-producing property might have been used to satisfy personal obligations arising from the division of marital rights and property. The Court sought to avoid a misclassification of personal expenses as business expenses under such circumstances. It reasoned:

the fees were incurred not to resist a liability, but to arrange how it could be met without depriving the taxpayer of income-producing property, the loss of which would have destroyed his capacity to earn income. * * *

\*    \*    \*    \*    \*    \*    \*

It would be unsound to make deductibility turn on the nature of the measures taken to forestall a claim rather than the source of the claim itself. [*United States v. Patrick, supra* at 56–57.]

Theft loss deductions, under section 165(c)(3), are allowed to individuals without regard to whether the losses arise in connection with the taxpayer's profit-seeking activities. Accordingly, the rationale for the origin-of-the-claim analysis, as expressed by the Supreme Court in *Gilmore* and *Patrick*, is irrelevant to the legal and factual setting of the instant case. The majority has confused the origin-of-the-claim test of *Gilmore*, *Patrick*, and their ilk with the "look-back" rule of *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952).

Similarly, theft loss deductions, under section 165(c)(3), are allowed to individuals without regard to whether what was stolen was a capital asset in the taxpayer's hands. The Congress might have treated such losses as sales or exchanges, but it did not choose to do so. Rather, the Congress chose to allow an ordinary deduction for a theft loss, even if a sale of the stolen asset would have produced a capital loss deduction (or no deduction at all, if the transaction had not been entered into for profit). Accordingly, it is not relevant in the instant case to analyze whether petitioner's expenditures are capital expenditures.

Not only do the history and rationale of the origin-of-the-claim rule argue against our reliance thereon in this case, but standard canons of judicial construction require a contrary result. The intent of section 165 is clear in the language of the statute itself. Where this is so, judicial interpretive concepts are subordinate to legislative expression, and they must not be allowed to negate the unequivocal allowance and benefit provided by Congress. See *United States v. American Trucking Associations*, 310 U.S. 534 (1940), discussed *infra*.

In the instant case, the majority plays a semantic game: Instead of wrestling with the meaning of "arising from" in section 165 (and resolving that question by reference to the statute itself), the majority chooses to consider the meaning of "resulting from" in the context of the inapplicable origin-of-the-claim rule. Such circuitous logic begs the basic question, the answer to which is apparent to me in the language of section 165. Examination of the statute supports my conclusion.

Section 165(a)[1] sets forth the general rule that any uncompensated loss shall be deductible. However, section 165(c) imposes limitations on deductibility in cases of losses sustained by individuals. It provides in relevant part:

In the case of an individual, the deduction under subsection (a) shall be limited to—

\*      \*      \*      \*      \*      \*      \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

Therefore, the deduction in the instant case can be allowed only if there was a theft and petitioner's loss arose therefrom within the meaning of the statute.

Resolution of the preliminary question of whether there was a theft is a relatively simple matter.[2] Section 1.165–8(d), Income Tax Regs., provides that:

---

[1]Sec. 165(a) provides: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

[2]The parties have stipulated as to the fact of theft under the described circumstances. However, because the stipulation was only for purposes of respondent's motion for summary judgment, we are not bound thereby, and we consider the issue independently of the stipulation.

For purposes of this section the term "theft" shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery.

Thus, the statute does not use "theft" as a technical term, but rather in its broader context encompassing any criminal appropriation of the property of another. See *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956), and cases cited thereat.

While Federal law determines Federal tax consequences, local law determines the underlying substance upon which those consequences fall. See *Morgan v. Commissioner*, 309 U.S. 78 (1940); *Lyeth v. Hoey*, 305 U.S. 188 (1938). Thus, whether or not a theft occurred must be determined by reference to the law of the jurisdiction in which events giving rise to the claim of theft occurred. *Edwards v. Bromberg, supra* at 111. In the case now before us, petitioner's assertion of theft stems from the invalid second sale of rights by Dooley to Mason in Arkansas in 1916. The applicable law of the State of Arkansas in effect at that time provided:[3]

Sec. 1689. *Every person who, with intent to defraud or cheat another*, shall designedly, by color or any false token or writing, or *by any other false pretense*, obtain a signature of any person to any written instrument, or *obtain from any person any money, personal property, right in action, or other valuable thing or effects whatever*, upon conviction thereof shall be deemed guilty of larceny and punished accordingly.

   \*      \*      \*      \*      \*      \*      \*

Sec. 1691. If, upon the trial of any person indicted for any offense prohibited in \* \* \* [Sec. 1689 or unrelated sec. 1690], it shall be proved that he obtained the property or thing in question *in such manner as to amount to larceny*, he shall not, by reason thereof, be entitled to an acquittal, but he shall be convicted and punished as if the offense had been proved as charged. [Emphasis added.]

Upon sale of his rights to Mason in 1916, Dooley was aware that he had previously assigned the same rights to Black in 1898. Thus, his acceptance of consideration from Mason was a fraudulent taking under false pretenses. Analysis of the applicable statutes and the facts as found support our conclu-

---

[3]The quoted statutes are from Kirby & Castle's Digest of the Statutes of Arkansas, 1904. The same provisions were recodified as secs. 1784 and 1786 in King & Castle's Digest of the Statutes of Arkansas, 1916.

sion that Dooley's sale of rights to Mason constituted larceny and, hence, theft under Arkansas law.

Having found that there was a theft,[4] we turn to the question of whether petitioner's loss arose therefrom within the meaning of the statute. The parties to this case offer widely different interpretations of the language of section 165. Under petitioner's reasoning, section 165(a) permits a deduction where loss has occurred, and section 165(c)(3) merely describes the type of required loss. In other words, "theft" is an adjective modifying the operative noun "loss," but "theft" itself is not the subject of the deduction. Thus, in order to avail himself of section 165(a), petitioner must suffer a "loss"; he need not, however, suffer a "theft."

By contrast, respondent urges us to read section 165(c) as the statutory object of section 165, not as a mere modifier of section 165(a). Under this view, petitioner must be the victim of a theft *from which arises* a loss, and not merely the victim of a loss *which arises from* a theft. Therefore, respondent would deny the benefit of section 165(a) where there is no direct victim relationship between petitioner and the act of theft.

The language of section 165(c)(3) itself requires that "losses *arise * * * from* theft." In the absence of any compelling reason to disregard the plain language of the statute or its logical result, the legislative mandate of Congress must be taken at its word. This canon of judicial construction was well expressed by the Supreme Court in its opinion in *United States v. American Trucking Associations, supra* at 543. The Court explained:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the

---

[4]We note that our finding of theft is only for purposes of determination of petitioner's tax liability and is not intended as a finding of criminal liability of Dooley, an issue which is beyond the purview of this Court. The evidentiary problems confronting the 1984 proving of an alleged 1916 larceny are undoubtedly numerous. Petitioner, however, need not offer sufficient evidence for a successful civil or criminal lawsuit in order to be entitled to a loss deduction. See *Jacobson v. Commissioner,* 73 T.C. 610, 613 (1979).

legislation as a whole" this Court has followed that purpose, rather than the literal words. * * * [Fn. refs. omitted.]

In the instant case, the plain meaning of the statute itself is clear. The result produced is not "absurd or futile," but rather is congruent with the legislative intent of allowing taxpayers to recoup uncompensated losses through tax deductions. It is true, of course, that in the overwhelming majority of cases, a taxpayer who suffers a theft loss will simultaneously be the victim of the theft from which the loss arises. In unusual circumstances, however, such as those which confront petitioner in this instance, dual victimization will not result. Where this is so, it must be borne in mind that the target of section 165 is treatment of losses, not treatment of thefts.

The intended direct connection *between the taxpayer and the loss* is clearly expressed in the requirements of section 165(a). Section 165(c)(3) modifies section 165(a) only by requiring that there be a causal connection *between the loss and the theft*. There is, however, no legislative expression of any similar connection *between the taxpayer and the theft*, and we find no reason to infer such requirement. Therefore, petitioner need only prove that he has suffered a loss and that said loss arose from theft. Having carried this burden of proof, he need not demonstrate any direct relationship between himself and the act of theft.

In the instant case, petitioner has shown that his loss arose as a result of theft. The litigation between petitioner and Spoo was the mechanism through which petitioner became liable for payment; the fact of loss itself, however, stemmed from the earlier theft by Dooley. The *loss* arose from theft in a substantive, plain-language sense. The fact that petitioner's *liability* for payment occasioned by the theft was established through litigation should not be used to becloud the clear origin of the loss.

For the reasons discussed above, I would find that petitioner sustained a loss as required by section 165(a) of the type defined in section 165(c)(3). Therefore, he is entitled to his claimed deduction.

The timing of the deduction is governed by section 165(e) which provides that:

For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

In the instant case, there is no evidence that petitioner was aware of any defect in the rights when he purchased them from Wood in 1959. To the contrary, petitioner submitted his Washington application sometime after April of 1959 but before July of 1960. In rejecting that application, the BLM cited unavailability of entitled lands, but not any invalidity of rights. Petitioner's failure to exercise his right of contractual recision prior to its expiration on December 31, 1959, supports the conclusion that he believed his rights to be valid and, therefore, had not yet discovered the earlier theft. The BLM's validation of rights of petitioner's successor in connection with Douglas' Nevada application confirms the fact that the theft remained undiscovered. Knowledge of the theft became available only after the BLM's denial of Douglas' Oregon application and the resulting litigation. The 1916 theft was not determined until 1977 when the Court of Appeals affirmed the judgment against petitioner. Prior to this determination, petitioner was not aware of the duplicate chain of title and the corresponding invalidity of his rights; hence, petitioner discovered his loss only upon receiving the pronouncement of the court in 1977. Therefore, 1977 is the proper taxable year in which petitioner may deduct his loss.

For the reasons discussed above, I would allow petitioner to deduct his loss under section 165. Perhaps the correctness of this result appears more clear in examples less complicated than the situation in the instant case. Consider, instead, the tax consequences to taxpayers A and B in the following hypothetical situations.

(1) A buys a used car for $1,000. One year and one day later, the car is stolen from A. Assume that the value of the car on the day it is stolen is still $1,000, and assume further that there are no adjustments to A's basis in the car.

(2) B buys a used car from X for $1,000. One year and one day later, B sells the car to C for $1,000. B reports no gain or loss on the sale. It is then determined that X had stolen the car from Y. Y succeeds in requiring C to give the car back to Y. C succeeds in requiring B to refund the $1,000 to C.

Under the reasoning of the majority, A would be entitled to a theft loss under section 165. B, however, would instead be

required to capitalize his loss on the theory that it arose from an obligation incurred through the sale by B to C, rather than from the theft by X. Both A and B have sustained the same economic loss of $1,000, and the loss of each has arisen from an act of theft. However, the majority would allow a theft loss to A only, thus affording disparate treatment to similarly situated taxpayers and depriving B of the opportunity to avail himself of the relief intended by the plain language of section 165. My resolution of the instant case would avoid this unwarranted and unfair result.

The misguided result of the majority's approach can be seen in the figures involved in this case. In round numbers, petitioner paid $4,000 for the stolen property, sold it for $8,000, and was sued and held liable for $20,000, exclusive of costs. Petitioner expended a total of $24,000, against which he had a receipt of only $8,000. This produced a net loss of $16,000 beyond that for which basis can be found. While in my opinion the entire $20,000 paid in damages is an ordinary loss, it would seem that, even if this view is not shared, at least the $16,000 paid by petitioner in excess of his receipt of $8,000 ought to be treated as a loss which arose from theft.

FAY, WILBUR, CHABOT, NIMS, and CLAPP, *JJ.*, agree with this dissent.