DAVID AND ROSALIE JENSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jensen v. Commissioner
Docket No. 24652-89
United States Tax Court
T.C. Memo 1993-393; 1993 Tax Ct. Memo LEXIS 404; 66 T.C.M. (CCH) 543; August 26, 1993, Filed *404 Decision will be entered under Rule 155. For petitioners: Donald J. Purser, and David C. Wright. For respondent: Mark H. Howard. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $ 275,647 in petitioners' 1984 Federal income tax and additions to tax under section 6651 in the amount of $ 68,952 and under section 6661 in the amount of $ 68,912. All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Petitioners requested and received two extensions of time to file their 1984 Federal income tax return, the second of which expired on October 15, 1985. Petitioners' accountant prepared a Form 1040 and related schedules for 1984 from information provided by petitioners; however, petitioners never signed the form. Petitioners filed the unsigned Form 1040 and related schedules with respondent's Ogden, Utah, Service Center on October 20, 1986. The parties agree that the unsigned Form 1040 is not a valid tax return. Respondent used the invalid tax return as a starting point for determining petitioners' *405 deficiency for 1984. The parties have stipulated certain items of income and deduction for petitioners' 1984 tax year. On brief, petitioners conceded the section 6651 addition to tax and respondent conceded the section 6661 addition to tax. After concessions by the parties, the remaining issues for decision are: (1) Whether petitioners are entitled to a theft loss for an investment which turned out to be a Ponzi scheme; [1] (2) whether petitioners are entitled to certain deductions claimed on petitioner husband's Schedule C; (3) whether petitioners are entitled to additional deductions not reported on petitioner husband's Schedule C; (4) whether petitioners are entitled to additional deductions for partnership losses; (5) whether certain items of income were correctly reported on petitioner husband's Schedule C; (6) whether petitioners have additional items of income not reported on their 1984 Form 1040; (7) whether petitioners have elected joint return status; and (8) whether petitioner wife is an innocent spouse. *406 FINDINGS OF FACT We incorporate by reference the first and second stipulations of fact and the attached exhibits. At the time the petition in this case was filed, petitioners were residents of Las Vegas, Nevada. During the year in issue, petitioner husband was a business consultant and petitioner wife was a real estate agent. In February 1984 Lanny Howarter (Howarter), a business associate of petitioner husband, approached petitioners regarding an investment in a seafood importing business. Howarter was an insurance broker who also provided investment opportunities to his clients. Howarter promised petitioners a rate of return of 7 percent per month. Petitioners invested $ 388,000 in the venture from March through July of 1984. Petitioners received returns on their investment totaling $ 50,200 from April through June of 1984. The seafood importing business was not a legitimate investment; it was a Ponzi scheme executed by Richard Alan Hunt (Hunt) and Charles Browning (Browning), the principals of Chacklan Enterprises, Inc. (Chacklan). Hunt and Browning met with Howarter in October 1983 and explained how the investment in Chacklan was to work. Money invested in Chacklan *407 was to go into a collateral funding account to be used as security for Chacklan's loans. The money never was to leave the United States. The seafood was to be shipped from Mexico to a bonded warehouse in San Diego. Chacklan was to have buyers ready to purchase the product most of the time. When a buyer was not immediately available, Chacklan was to use the money in the collateral funding account as collateral on short-term bank loans. Once the product was sold, the bank loan would be paid off, and the remainder of the proceeds would be distributed to investors as profits. After investigating Chacklan's operation, Howarter decided to invest in the company and negotiated an agreement with Hunt and Browning. Under the agreement, Howarter was to receive a stated return on his investment and had a right of first refusal whenever Chacklan needed additional funds. Howarter invested some of his own money in Chacklan and also offered his clients, including petitioners, an opportunity to invest in the venture. Howarter pooled the funds and sent them to Chacklan. When the profits were distributed, Howarter received the funds and disbursed them to the individual investors. The investors *408 who invested through Howarter would agree with Howarter on a set rate of return which was generally less than the rate of return agreed to between Howarter and Hunt and Browning. When the profits were distributed, Howarter kept, as compensation, the difference between the rate of return he agreed to with Hunt and Browning and the rate of return that he agreed to with his clients. Hunt and Browning were aware of Howarter's arrangements with his clients and referred investors to Howarter so they could invest through him. Howarter was, in essence, a broker for his clients with respect to the Chacklan investment. He did not promote the Chacklan investment as a loan and did not consider the money he received from his clients to be loans. In the Collateral Funding Account (CFA) Investment Contract entered into by Howarter and most of his clients, Howarter called himself a "procurement agent" for the Chacklan investment. Howarter acted as a conduit through which investments passed from the investors to Chacklan and earnings passed from Chacklan to the investors. There was a slowdown of money coming out of Chacklan beginning in May 1984, which Hunt and Browning said was due to a slowdown *409 in the fishing season. Chacklan was supposed to be fully operational again by the beginning of August, and Hunt and Browning continued to offer opportunities for further investment. In August, petitioner husband decided to investigate the Chacklan operation and flew to San Diego to see the company's books. After discovering that the money that was supposed to be in the collateral account was gone and being told that it had been advanced into Mexico, petitioner husband arranged to have an independent accountant review Chacklan's books. Following petitioner husband's investigation and additional inquiries of his own, Howarter learned that the Chacklan operation was a fraud, and all of the investors' money was gone. Howarter notified the Federal Bureau of Investigation (FBI). An FBI agent investigated Chacklan and determined that it was a Ponzi scheme and that the investors' money was gone by the end of 1984. In November, Howarter forced Chacklan into bankruptcy in order to salvage what he could from the venture. The Chapter 11 bankruptcy (reorganization) petition was filed on November 20, 1984, and the case was converted to a Chapter 7 bankruptcy (liquidation) proceeding on *410 April 17, 1985. At the time of the bankruptcy filing, Chacklan's only remaining assets were some inventory at the bonded warehouse, which had to be sold to a pet food company, and some office furniture. The assets were not sufficient to pay any of the creditors' claims, and creditors were advised not to file proofs of claims. Petitioners never filed a proof of claim in the Chacklan bankruptcy proceeding. The only funds ever received by Chacklan creditors were the result of litigation against the banks and attorneys involved in the Chacklan venture. On February 6, 1985, Howarter filed a Chapter 7 bankruptcy petition. Petitioners filed a proof of claim with the bankruptcy court for money invested in Chacklan and for money invested in a partnership they had formed with Howarter. The bankruptcy court allowed a claim of $ 397,600. Howarter's bankruptcy estate participated in the Chacklan litigation and recovered $ 128,993.13 in 1990. Petitioners received $ 13,372.42 from Howarter's bankruptcy estate in 1992. In late 1983 or early 1984, petitioners and Howarter and his wife agreed to form a partnership for the purpose of owning two condominiums in Park City, Utah. The partnership *411 expenses and profits were to be shared equally between the two couples. The Howarters purchased the condominium with the higher value, and petitioners purchased the other unit. Petitioners contributed additional funds to make up the difference between the prices of the two condominiums. On the advice of an attorney, petitioners quitclaimed their condominium to the Howarters, and the Howarters quitclaimed their condominium to petitioners in order to provide documentation for the equal partnership. Petitioners recorded the deed they received from the Howarters on January 21, 1985. The condominium eventually became part of Howarter's bankruptcy estate and was foreclosed by Prudential Federal Savings and Loan Association on June 30, 1986. Petitioners also received a quitclaim deed from Gregory and Nancy Harper for a tract of land in Summit County, Utah, on December 21, 1984. The deed states that it is in consideration of petitioners' cancellation of a debt owed them by Jo Ann and David Juberg. The deed was recorded on January 21, 1985. Petitioners' accountant, Gordon Jones (Jones), prepared petitioners' 1984 Form 1040 and related schedules in October of 1985. In order to determine *412 petitioner husband's Schedule C income, Jones gathered Forms 1099 and company records to which he had access and supplemented that information with any additional information petitioner husband had regarding his income. From that information, Jones prepared a workpaper listing petitioner husband's Schedule C income. Among the items deducted on petitioner husband's Schedule C were a $ 12,600 payment to Robert Fife as part of a legal settlement and a $ 40,000 payment to Misho, Inc. for a research and development investment. Petitioners received a Form 1099 for 1984 from Jupiter Property Management reporting income of $ 110. The Form 1099 has a notation indicating that it relates to unit 225. Petitioners' 1984 Schedule E includes income from condominium unit 225. Petitioners received six Forms 1099 for 1984 from Edward Brown Securities relating to the sale of Cavalier Capital Corporation stock. The Forms 1099 totaled $ 6,684. On their 1984 Schedule D, petitioners listed sales of Cavalier Capital Corporation stock totaling $ 4,734. Petitioners received a Form 1099 for 1984 from the State of Utah in the amount of $ 214. The Form 1099 indicates that it is for petitioners' State *413 income tax refund for the 1982 tax year. Petitioners did not deduct their Utah income tax on their 1982 return. Petitioner wife received a Form 1099 for 1984 showing a total distribution of $ 869, of which $ 176 was capital gains, $ 616 was dividends not qualifying for exclusion, and $ 77 was dividends qualifying for exclusion. Petitioners' Schedule B lists the distribution, and the dividends not qualifying for exclusion were listed on line 9 of petitioners' Form 1040. Although petitioners filed their 1984 Form 1040 unsigned, respondent treated it as a joint return. Respondent used the unsigned return as the starting point and determined petitioners' deficiency by disallowing certain deductions taken on the unsigned return. Respondent issued a joint notice of deficiency on July 7, 1989. Petitioner wife was involved in the preparation of petitioners' tax return. She provided Jones with summaries of business expenses and other information required to prepare the return. The summaries contained information related to petitioner husband's business deals, including the Chacklan deal. In addition, petitioner wife performed accounting and record keeping duties related to her husband's *414 business affairs. Petitioner wife intended the unsigned 1984 Form 1040 and related schedules to be her 1984 income tax return. Petitioner wife was knowledgeable in tax matters as a result of prior employment at the Internal Revenue Service. OPINION Theft Loss Issue
Under section 165(a) petitioners are entitled to a deduction for "any loss sustained during the taxable year and not compensated for by insurance". Section 165(c) limits the deduction for individuals to losses incurred in a trade or business, losses incurred in a transaction engaged in for profit, and casualty and theft losses. Under section 165(e), "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Moreover, a taxpayer is not entitled to deduct a loss if he has a claim for reimbursement and there is a reasonable prospect of recovery. Sec. 1.165-1(d)(2)(i) and (3), Income Tax Regs.
Petitioners argue that they are entitled to a theft loss deduction for their investment in Chacklan. They contend that the Chacklan scheme was a theft and that, at the end of 1984, they had no reasonable prospect of recovering their stolen investment. *415 Respondent agrees that a theft occurred. The parties stipulated that the "FBI concluded that the manner in which Chacklan Enterprises had been operating was in the nature of a Ponzi scheme which defrauded persons who had invested money with Chacklan Enterprises, Inc." Moreover, at trial, respondent's counsel stated that respondent agreed "that Chacklan Enterprises was conducted as a Ponzi scheme and that a theft occurred." However, respondent argues that petitioners are not entitled to a theft loss because they were not investors in Chacklan. Respondent contends that Howarter was the investor in Chacklan, and petitioners merely invested with Howarter. As support for that argument, respondent emphasizes that petitioners had no direct contact with Chacklan and that only Howarter had any direct arrangement with Hunt and Browning. Finally, respondent asserts that petitioners had a reasonable prospect of recovery because they filed a proof of claim in the Howarter bankruptcy. We find, as a factual matter, that petitioners were investors in Chacklan. There is no requirement that an investor have direct contact with the entity in which he is investing. It is not uncommon for investors *416 to deal only with their brokers and never have direct contact with their investments. In such cases, the brokers act as conduits for the investors' funds. The record in the case before us indicates that Howarter's role in the Chacklan investment was that of a broker; he clearly was acting as a conduit for his clients' funds. All of the parties involved, including Hunt and Browning, understood that the funds that Howarter provided to Chacklan were not merely Howarter's funds but were also his clients' funds. Petitioners had the same arrangement with Howarter as all his other clients. They gave him their money for the sole purpose of investing in Chacklan through him. Therefore, as investors in Chacklan, petitioners were defrauded in the Chacklan scheme and are entitled to a theft loss in the year they discovered it if they then had no reasonable prospect of recovery. See Boothe v. Commissioner, 768 F.2d 1140 (9th Cir. 1985), revg. 82 T.C. 804 (1984). Respondent asserts that petitioners' bankruptcy claim against Howarter "gives rise to an inference of a reasonable prospect of recovery." Respondent argues that petitioners' *417 claim against Howarter was likely to, and eventually did, succeed, and therefore petitioners could not deduct the loss until 1992 when the final amount of their recovery was determined. We disagree. Although we held in Huey v. Commissioner, T.C. Memo. 1985-348, that the filing of a lawsuit creates an inference of a reasonable prospect of recovery, we conclude that petitioners' filing of a proof of claim in the bankruptcy case here does not lead to the same inference. Filing the proof of claim in the bankruptcy case was merely a ministerial act that did not require the same degree of effort as pursuing a lawsuit. Therefore, in order to determine whether petitioners had a reasonable prospect of recovery, we must objectively consider the facts and circumstances and determine if, at the end of 1984, it was likely that petitioners would recover their investment from Chacklan or Howarter. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975); Qureshi v. Commissioner, T.C. Memo. 1987-153, affd. without published opinion *418 843 F.2d 1388 (4th Cir. 1988). We note, however, that a "taxpayer is not required to be an 'incorrigible optimist,' and a claim for recovery with little potential for success will not require that the deduction be postponed." Geisler v. Commissioner, T.C. Memo. 1988-404 (citing United States v. White Dental Co., 274 U.S. 398, 403 (1927), affd. without published opinion 955 F.2d 47 (9th Cir. 1992)). At the end of 1984, Chacklan was in bankruptcy and had few assets and large debts. The likelihood of petitioners recovering anything from Chacklan was minimal, and petitioners never filed a proof of claim in the Chacklan bankruptcy case. Petitioners did have a claim against Howarter, who had obligated himself to repay his clients' investments; however, Howarter's ability to fulfill that obligation was very questionable at the end of 1984. He had invested a substantial amount of his own money in the Chacklan scheme and was obligated to pay millions of dollars to his clients. In such a circumstance, we find it was not reasonable for petitioners to expect to recover their *419 investment. Therefore, we hold that petitioners are entitled to a theft loss deduction for 1984 for their investment in Chacklan. Substantiation Issues
The parties have raised a number of issues that turn on the substantiation of deductions and income. The key to these issues is whether the party with the burden of proof has presented sufficient evidence. For most of these issues, respondent's determination is presumed to be correct, and petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, respondent has placed at issue additional items of income which were not part of the notice of deficiency and respondent bears the burden of proof with respect to those items. Rule 142(a). Disallowed Deductions on Petitioner Husband's Schedule C
The parties have agreed that petitioner husband sustained Schedule C interest expenses in the amount of $ 62,297. However, respondent argues that $ 59,928 of that interest is subject to the limitation under section 163(d). Section 163(d) limits the deduction for investment interest to the amount of net investment *420 income. Petitioners have not presented any argument regarding the section 163(d) limitation. However, the parties agree that petitioners received income of $ 50,200 on their Chacklan investment; therefore, petitioners are entitled to a deduction, at least to that extent. Respondent disallowed a $ 12,600 deduction for a payment in settlement of a lawsuit. The parties agree that the payment was made in 1984, but respondent argues that petitioners did not provide sufficient evidence that the settled claim related to petitioner husband's business. We agree. Petitioner husband testified that the settled claim was a dispute over commissions but presented no documentation relating to the lawsuit or the settlement. Absent additional evidence, we do not find petitioner husband's testimony sufficiently credible to carry the burden of proof. Consequently, petitioners are not entitled to a deduction for the settlement payment. Respondent also disallowed a deduction for a $ 40,000 payment to Misho, Inc. for a research and development investment. Although petitioners presented adequate evidence that such a payment was made, they did not present any evidence, other than petitioner husband's *421 testimony, that the investment was lost. Again, we find such testimony, absent other evidence, to be insufficient to carry petitioners' burden of proof and sustain respondent's denial of the deduction. Deductions Not Reported on Petitioner Husband's Schedule C
Petitioners claim that they are entitled to an additional business expense deduction in the amount of $ 2,000 for commissions paid to Lanny Howarter. However, petitioners have not presented any evidence that the commissions paid related to business rather than personal matters. Howarter testified that he did not recall for what services he earned the commissions, and the notation on the check merely states that $ 2,000 of the payment was for commissions, with no further explanation. Therefore, petitioners have not met their burden of proving that the payment of the commissions was a legitimate business expense deduction. Petitioners also argue that they are entitled to an additional deduction for losses related to a failed condominium partnership with Howarter. Howarter's testimony confirms that such a partnership existed and that petitioners made contributions to the partnership. Moreover, Howarter testified that *422 the condominium held in his and his wife's name was lost in his bankruptcy proceeding. However, the loss did not occur in 1984. Howarter did not file for bankruptcy until February 6, 1985, and the foreclosure on the condominium did not occur until June 30, 1986. Accordingly, petitioners cannot deduct any loss on the condominium partnership in 1984. Additional Deductions for Partnership Losses
In their reply brief, petitioners argue for the first time that their Schedules K-1 for two partnerships show that they are entitled to additional deductions for partnership losses. They did not raise this issue at trial or in their opening brief, and it is too late now for petitioners to introduce a new issue. Moreover, petitioners did not introduce any evidence of their basis in the two partnerships; therefore they have not proven that they are entitled to the deductions for the partnership losses. Income Items Reported on Petitioner Husband's Schedule C
Petitioners argue that a number of items of income that were listed on Jones' workpaper and included in petitioner husband's Schedule C income were incorrectly included in income. Respondent has conceded that the item listed *423 on Jones' workpaper as "IRS Harassment Income" was not properly included in income. Moreover, respondent agrees that petitioners have shown that their income from Vencor, shown on Jones' workpaper as $ 140,000, was only $ 7,000. However, respondent contends that petitioners did not provide sufficient evidence to show that they did not earn the remaining contested items of income listed on Jones' workpaper. The remaining contested items of income which are listed on Jones' workpaper are: Voyager, Consumer Research, Dynatronics, Research Industries, and Culley Davis interest. In addition, petitioners claim that they did not earn even $ 7,000 from Vencor in 1984. For Voyager, Consumer Research, Dynatronics, and Research Industries, petitioners argue that they did not receive income from those entities. Petitioners claim that when petitioner husband was providing income information to Jones, he mentioned those entities because he had sales of their stock in 1984 or 1985, and those stock sales were improperly included in petitioner husband's Schedule C income for 1984. In addition, petitioners contend that the item of income labeled "Culley Davis interest" was improperly included *424 in petitioner husband's Schedule C income because he never received that interest. He testified that he told Jones that he had interest income because Culley Davis owed him money, and he "presumed" he would get interest in the amount of $ 50,000. We do not find petitioners' explanations to be credible. At the time Jones was preparing petitioners' return, petitioner husband met with him and provided him with information about income and deductions for 1984. That meeting took place much closer to the actual transactions than the trial, and petitioner husband's memory of the transaction would have been much clearer. Moreover, at trial petitioner husband testified that he did not remember what some of the notes on Jones' workpaper meant, and he did not know exactly what he and Jones talked about with regard to some of the contested items. Accordingly, given petitioner's failure to present any evidence other than petitioner husband's questionable testimony, we hold that petitioners have failed to prove that the income items from Voyager, Consumer Research, Dynatronics, Research Industries, and Culley Davis were not properly included in petitioner husband's Schedule C income. Additionally, *425 we hold that the evidence shows that petitioner husband received as income $ 7,000 worth of Vencor stock in 1984, not in 1985 as petitioners contend. The Vencor prospectus states that petitioner husband received $ 7,000 worth of Vencor stock on incorporation of the company which occurred in July of 1984. Petitioners argue that they did not receive the stock until 1985 and point to a stock certificate dated December 10, 1985, as evidence of when they received the Vencor stock. However, that stock certificate was issued to Culley and Camille Davis, and there is no evidence that it was ever transferred to petitioners. Moreover, even if the stock certificate was transferred to petitioners, there is no proof that this was the first Vencor stock transferred to petitioners. Therefore, $ 7,000 of income from Vencor was properly included in petitioner husband's Schedule C income. Additional Items of Income Not Reported By Petitioners
As noted above, respondent argues that petitioners have additional items of income not reported on their 1984 return and not taken into account in the notice of deficiency. Respondent has the burden of proof on those items. Respondent contends that *426 petitioners failed to report $ 110 of income reported on a Form 1099 issued by Jupiter Property Management and that they have additional income in that amount. However, the Form 1099 indicates that it relates to unit 225. Petitioners reported income in excess of $ 110 from unit 225 and respondent has failed to prove that the $ 110 from Jupiter Property Management was not included in that amount. We hold that petitioners do not have additional income of $ 110 related to the Form 1099 issued by Jupiter Property Management. Petitioners' Schedule D shows total sales of Cavalier Capital Corporation stock in the amount of $ 4,734 with a basis of $ 2,000 and a capital gain of $ 2,734. Petitioners received Forms 1099 from Edward Brown Securities showing total sales of Cavalier Capital Corporation stock of $ 6,684. Respondent argues that the Forms 1099 prove that petitioners have additional capital gain of $ 1,950. However, the Forms 1099 are not sufficient evidence of petitioners' gain on the sale of their stock; they merely show the total sales price of petitioners' stock. Respondent has not offered any evidence of petitioners' basis in the additional $ 1,950 worth of stock and, *427 therefore, has not shown that petitioners had a gain on the sale of that stock. We hold that respondent has not met the burden of proving that petitioners had additional capital gain on the sale of their Cavalier Capital Corporation stock. In 1984 petitioners received a Form 1099 from the State of Utah showing an income tax refund for 1982 in the amount of $ 214. Respondent argues that petitioners have additional income in that amount. However, petitioners' 1982 Form 1040 shows that petitioners did not deduct their Utah income tax. Nor is there evidence that they deducted their 1982 Utah income tax on any other Federal return. As a result, respondent has failed to carry her burden on this issue, and petitioners do not have to include their State income tax refund in income. Respondent further contends that petitioners failed to report a corporate distribution shown on a Form 1099 issued to petitioner wife. Such contention is incorrect; petitioners reported that distribution on their Schedule B. Petitioners received returns on their Chacklan investment totaling $ 50,200. Respondent argues that the amount should be included in petitioners' income. Given our holding that petitioners *428 are entitled to a theft loss deduction for their Chacklan investment, petitioners agree. Respondent argues that petitioners also have additional income due to the quitclaim deed of real property from Gregory and Nancy Harper to petitioners. Respondent asserts that we should hold this deed to be income to petitioners, even though the deed, on its face, says it is in cancellation of a debt, because petitioners failed to provide respondent with any documents related to the loan which was canceled, pursuant to a subpoena, and failed to present any evidence at trial regarding the canceled loan. Although we do not sanction petitioners' failure to timely comply with the subpoena, we do not believe that the appropriate sanction in this case is to relieve respondent of the burden of proof on this issue. There was an indication at trial that petitioners were confused about the appropriate time to provide the documents, and albeit such confusion may not have been reasonable, the appropriate sanction would be to refuse to permit any evidence regarding unproduced documents. The only evidence introduced regarding the Harper deed was the deed itself, introduced by respondent, and that evidence *429 supports a finding that the deed was not income to petitioners. There is no indication that respondent made any effort, other than a general subpoena of petitioners' records, to obtain any further information regarding the deed. Respondent did not even question petitioner at trial regarding this deed or ask any of the other parties involved in the transaction to be witness in this case. Given respondent's total lack of evidence on this issue, we find that respondent failed to prove that the Harper deed was anything other than what it purported to be, a cancellation of a debt, and therefore it is not income to petitioners. Finally, respondent contends that petitioners have income as the result of the Howarters' quitclaim deed of the Park City condominium to them. Howarter explained that the deed of the condominium was intended to formalize the partnership agreement between petitioners and the Howarters. In addition, Howarter testified that petitioners executed a quitclaim deed for their Park City condominium in favor of the Howarters. We found Howarter's testimony to be credible, and respondent presented no contrary evidence. Accordingly, we hold that the Howarter quitclaim *430 deed was not income to petitioners. Joint Liability Issue
On brief, petitioners argue that because they did not file a valid return, they did not make an election to file jointly under section 6013(a) and section 1.6013-1(a), Income Tax Regs. As a result of their failure to make an election to file jointly, petitioners argue, petitioner wife is liable only for her own tax liability and not for petitioner husband's tax liability. In reply, respondent agrees that petitioners did not make an election to file a joint return and contends that both petitioners are individually liable for their own tax obligations as married persons filing separately. However, neither party has provided any information to enable us to separate the tax liabilities of the two petitioners. We note, first, that even absent a valid joint return, we have jurisdiction over both petitioners in this case. No tax return need be filed in order for respondent to issue a valid notice of deficiency. Roat v. Commissioner, 847 F.2d 1379, 1381 (9th Cir. 1988). Moreover, we have held that when a joint notice of deficiency was issued by respondent and it was later decided that *431 no valid joint return was filed, the Court still retained jurisdiction to determine the individual tax liability of each spouse. Stanley v. Commissioner, 81 T.C. 634, 639 (1983). We next address whether petitioners can be treated as having elected to file a joint return. Petitioners intended to file a joint return. Respondent accepted the unsigned return and issued a joint notice of deficiency based on that return. Petitioners filed a joint petition, and throughout the pleadings and the trial, both parties proceeded as though petitioners had filed a joint return. Only on brief did the parties raise the issue of petitioners' filing status. We conclude that the parties raised this issue too late. At this late stage, we do not have the information necessary to divide all of the petitioners' income and deductions between them, and we do not believe that an arbitrary division of such items would reach the right result in this case. Therefore, we hold that, for the purposes of determining petitioners' tax for 1984, we shall treat petitioners as though they elected to file a joint return. Innocent Spouse Issue
Finally, petitioners argue that, *432 if they are treated as having filed a joint return, petitioner wife is entitled to innocent spouse protection. To qualify for innocent spouse relief under section 6013(e), a taxpayer must show: (1) A joint return was filed for the year at issue; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on the return; (3) the innocent spouse, in signing the return, did not know or have reason to know of the substantial understatement; and (4) under all of the facts and circumstances, it would be inequitable to hold the innocent spouse liable for the deficiency and tax resulting from the substantial understatement. A substantial understatement is an understatement that exceeds $ 500. Sec. 6013(e)(3). A grossly erroneous item is "any item of gross income attributable to such spouse which is omitted from gross income" and "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law." Sec. 6013(e)(2)(A) and (B). We have held -- a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction had no basis in law when *433 the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility ** *. [Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986).]
A taxpayer's failure to substantiate a deduction is not sufficient proof that the deduction had no basis in fact. Id. at 763. After petitioners' income tax is adjusted in accordance with the stipulations in this case and our opinion, we do not think that there will be a substantial understatement as defined by section 6013(e)(3). However, even if there is, we hold that the erroneous items did not lack basis in fact or law. The disallowed deductions at issue in this case failed for lack of substantiation and, therefore, were not grossly erroneous. Finally, we conclude that petitioner wife had reason to know of the substantial understatement. She was involved in petitioner husband's business matters to the extent of performing accounting and recordkeeping duties for his business. Moreover, she was sufficiently familiar with the tax law that she should have been aware *434 of the understatement. Accordingly, we hold that petitioner wife is not entitled to innocent spouse relief under section 6013(e). Decision will be entered under Rule 155. Footnotes
1. A Ponzi scheme is a swindle in which victims are persuaded to invest in a high-return investment, and early returns are paid with money from later investments to encourage the scheme to spread. When the perpetrators of the scheme decide they have enough money or that they have been in operation long enough, they take the money and run.↩